15-589-cv
*MacDermid Printing Sols. LLC v. Cortron Corp.*

# In the

# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2015

No. 15-589-cv

MACDERMID PRINTING SOLUTIONS LLC,
*Plaintiff-Counter-Defendant–Appellee,*

v.

CORTRON CORPORATION,
*Defendant-Counter-Claimant–Appellant.*

On Appeal from the United States District Court
for the District of Connecticut

ARGUED: MAY 13, 2016
DECIDED: AUGUST 10, 2016

Before: CABRANES, STRAUB, and LOHIER, *Circuit Judges.*

On appeal from a judgment of the United States District Court for the District of Connecticut (Michael P. Shea, *Judge*), which awarded damages of $64,670,821 pursuant to a jury verdict on claims for violations of federal and state antitrust laws, breach of contract, misappropriation of trade secrets, spoliation, and violations of state statutes prohibiting computer crimes and unfair trade practices. Defendant-appellant argues that the District Court erred in denying a new trial or judgment as a matter of law on plaintiff-appellee's antitrust claims; permitting plaintiff-appellee to present evidence previously withheld under the attorney-client privilege and work-product doctrine; and failing to remit or to order a new trial on damages regarding the antitrust and trade-secrets claims.

We hold that the District Court erred in denying defendant-appellant judgment as a matter of law with respect to the antitrust claims because plaintiff-appellee failed to prove that the challenged conduct harmed competition. We therefore **REVERSE** the judgment of the District Court with respect to the federal and state antitrust claims. We otherwise **AFFIRM** the judgment of the District Court and **REMAND** the cause to the District Court to recalculate damages in a manner consistent with this opinion.

———————

JOHN R. HORVACK, JR. (James K. Robertson, Jr., Fatima Lahnin, John L. Cordani, Jr., *on the brief*), Carmody Torrance Sandak &

2

Hennessey LLP, New Haven, CT; *for Plaintiff-Counter-Defendant–Appellee.*

JOHN P. ELWOOD (Joshua S. Johnson, *on the brief*), Vinson & Elkins LLP, Washington, DC; Harry First, New York, NY; Craig A. Raabe, Nuala E. Droney, Robinson & Cole LLP, Hartford, CT; *for Defendant-Counter-Claimant–Appellant.*

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal primarily concerns the requirements for proving an adverse effect on competition for purposes of section 1 of the Sherman Act, 15 U.S.C. § 1, in cases where the plaintiff has not proved that the allegedly anticompetitive behavior led to higher prices, reduced output, or lower quality in the market. We hold that in such cases, a plaintiff may not prevail under the "rule of reason" merely by proving that (1) the defendant exercised "market power," and (2) the challenged behavior may have misled consumers to believe that certain products were no longer available, without showing that consumers actually experienced reduced access to those products.

Defendant-appellant Cortron Corp. ("Cortron") appeals from a February 17, 2015 judgment of the United States District Court for the District of Connecticut (Michael P. Shea, *Judge*), which awarded

3

damages of $64,670,821 pursuant to a jury verdict for plaintiff-appellee MacDermid Printing Solutions LLC ("MacDermid") on its claims for violations of federal and Connecticut antitrust laws, breach of contract, misappropriation of trade secrets, spoliation, and violations of Connecticut statutes prohibiting computer crimes and unfair trade practices. MacDermid had alleged that its commercial rival, nonparty E. I. du Pont de Nemours & Co. ("DuPont"), filed a bogus patent-infringement suit against Cortron, MacDermid's supplier, and that when Cortron and DuPont settled that suit, they entered into an anticompetitive conspiracy that damaged MacDermid's business and hurt consumers.

On appeal, Cortron argues that the District Court erred in (1) denying Cortron a new trial or judgment as a matter of law on its antitrust claims; (2) permitting MacDermid to present evidence of its lawyers' patent advice; (3) concluding that the jury's identical awards on each of the antitrust claims were not duplicative; and (4) failing to remit or to order a new trial on damages regarding the antitrust and trade-secrets claims.

We agree with Cortron that the District Court erred in denying Cortron judgment as a matter of law with respect to MacDermid's antitrust claims because MacDermid failed to present evidence that Cortron's conduct harmed competition. We therefore **REVERSE** the judgment of the District Court with respect to the antitrust claims. We otherwise **AFFIRM** the judgment of the District Court and **REMAND** the cause to the District Court to recalculate damages in a manner consistent with this opinion.

4

# I. BACKGROUND

## A. Factual Background[1]

MacDermid and DuPont market thermal flexographic processors, which are used to make plates for printing commercial packaging. Such processors are typically sold either to commercial printers, which produce packaging for consumer-goods companies, or to "trade shops," which supply plates to commercial printers.

DuPont introduced the first thermal flexographic processor in 2000, under the "FAST" trade name. In 2002, MacDermid began to develop an alternative to FAST, which it introduced in 2004 under the "LAVA" trade name. At all relevant times, MacDermid and DuPont were the only companies that marketed thermal flexographic processors, and DuPont had a dominant share of that market.[2]

Soon after introducing its LAVA machines, MacDermid entered into two contracts with Cortron. Under the "Joint Development Agreement," signed in November 2004, MacDermid would pay Cortron to develop a second-generation LAVA processor. Under the "Manufacturing Agreement," signed in April 2005,

---

[1] "Because this appeal follows a jury verdict, we view the facts in the light most favorable to the prevailing party," *i.e.*, MacDermid. *Vill. of Freeport v. Barrella*, 814 F.3d 594, 599 n.1 (2d Cir. 2016).

[2] MacDermid asserts in its brief that "DuPont controlled 90% of the relevant market," MacDermid Br. 21, but cites nothing in the record to support this figure. Nonetheless, Cortron does not dispute that DuPont controlled most of the relevant market.

5

MacDermid would pay Cortron to build first-generation LAVA processors and to safeguard MacDermid's proprietary information.

In 2008, DuPont scheduled a meeting with Cortron, ostensibly to discuss potential business opportunities. During the meeting, which took place on April 1, 2008, DuPont informed Cortron that it had filed a lawsuit alleging that Cortron's work for MacDermid infringed DuPont Patent No. 6,797,454 ("the '454 patent").

DuPont and Cortron settled that suit in June 2008. As part of the settlement, Cortron agreed "to immediately cease manufacturing, selling, and offering to sell" thermal flexographic systems;[3] "to immediately cease and desist providing all service and/or technical support" for LAVA products; and to give DuPont "all Technical Information relating to" LAVA.[4] In exchange, DuPont agreed, *inter alia*, to dismiss its patent-infringement suit with prejudice and to indemnify Cortron against any lawsuit brought by MacDermid. In addition, under a separate agreement, DuPont paid Cortron about $140,000 for design work related to certain DuPont products. Pursuant to the settlement agreement, Cortron gave DuPont all technical information it had regarding LAVA technology before deleting that information from its own systems. About five months later, Cortron ceased operations.

---

[3] Cortron was permitted to complete seven LAVA units then in progress, but was required to tell DuPont where those units would be shipped. J.A. 1287. "J.A." refers to the Joint Appendix.

[4] J.A. 1287, 1288.

DuPont announced the settlement in a press release issued on July 30, 2008:

> Under the terms of the agreement, Cortron . . . agrees to immediately cease manufacturing LAVA [processors], as well as to immediately discontinue providing all service, spare parts, and technical support for any LAVA equipment . . . . Thermal processing equipment manufactured by Cortron has been marketed and sold by MacDermid Printing Solutions, LLC under the LAVA trade name.[5]

Unsurprisingly, DuPont hoped that this press release would make potential customers "more likely to buy DuPont's FAST" processors and "less likely" to buy MacDermid's competing LAVA products.[6] Later that day, MacDermid issued its own press release, which accused DuPont of "inappropriately rais[ing] some questions regarding MacDermid's ability to support" its LAVA products and "assure[d] [MacDermid's] customers that it will continue to sell, support and service" LAVA equipment.[7]

Meanwhile, MacDermid had already started searching for a new manufacturer to replace Cortron. MacDermid had been concerned about Cortron's financial stability even before the DuPont

---

[5] J.A. 1312.

[6] J.A. 641.

[7] J.A. 1313.

lawsuit. In 2007, MacDermid had started to plan for Cortron's potential failure, and by February 2008, MacDermid had contacted three possible alternative suppliers. MacDermid's concerns only deepened after it learned about the pending litigation. In July 2008—after learning about DuPont's lawsuit, but before the Cortron-DuPont settlement agreement was announced—MacDermid decided to switch from Cortron to a new manufacturer, OLEC Corporation.

Ordinarily, MacDermid would have expected Cortron to facilitate the transition by transferring to OLEC any technical information it had regarding LAVA machines. But because Cortron had given all extant LAVA technical information to DuPont, and because MacDermid did not have its own copy of that information, OLEC had to reverse-engineer the specifications needed to manufacture new LAVA machines. The reverse-engineering process cost $29,970 and took about nine months. During this transition period, MacDermid was unable to obtain new LAVA machines. Nonetheless, MacDermid always retained an inventory of LAVA processors and "never was unable to fulfill a sale," according to the testimony of its general manager.[8]

## B. Procedural History

MacDermid filed the instant action in September 2008 in Connecticut state court, alleging that Cortron and DuPont had engaged in an antitrust conspiracy in violation of section 1 of the

---

[8] J.A. 511.

Sherman Act, 15 U.S.C. § 1, and the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26, 35-28. MacDermid also brought claims under the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §§ 35-50 to 35-58; under the state computer-crime statute, Conn. Gen. Stat. §§ 53a-251, 52-570b; under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a to 42-110q; under state contract law; and for spoliation of evidence. Cortron filed various counterclaims[9] and removed the case to the United States District Court for the District of Connecticut.

After a trial in June and July 2014, the jury found for MacDermid on all issues and awarded it approximately $35.4 million in compensatory damages.[10] The District Court denied Cortron's post-verdict motion for judgment as a matter of law, and denied its post-verdict motion for a new trial on condition that MacDermid agree to a remitted award of $19,757,854 in compensatory damages.[11]

---

[9] Namely, for breach of contract, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, quantum meruit, breach of the covenant of good faith and fair dealing, and violation of CUTPA.

[10] The jury awarded $7,903,909 on the breach-of-contract claim; $3,941,325 on each of the three antitrust claims; $3,790,939 under CUTSA; $29,970 on the computer-crime claim; and $11,875,204 under CUTPA. Pursuant to Federal Rule of Civil Procedure 50(a), the District Court granted judgment as a matter of law to MacDermid on one of Cortron's counterclaims for fraud and negligent misrepresentation. *See MacDermid Printing Sols., Inc. v. Cortron Corp.*, No. 3:08-CV-1649 (MPS), 2014 WL 3943629, at *1 (D. Conn. Aug. 12, 2014).

[11] *MacDermid Printing Sols., LLC v. Cortron Corp.*, No. 3:08-CV-1649 (MPS), 2014 WL 3943629, at *17 (D. Conn. Jan. 20, 2015).

The District Court also awarded punitive damages of $3,790,939 under CUTSA "as punishment for Cortron's willful and malicious disclosure of MacDermid's trade secrets," as well as $100,000 in punitive damages for the "intentional or recklessly indifferent violation of CUTPA in destroying MacDermid's trade secrets."[12] All told, the final judgment against Cortron—including attorneys' fees, interest, and treble antitrust damages—totaled $64,670,821. This appeal followed.

## II. DISCUSSION

### A. Judgment as a Matter of Law on MacDermid's Antitrust Claims

We first consider Cortron's argument that the District Court erred in denying it judgment as a matter of law ("JMOL") on MacDermid's federal and state antitrust claims.

#### 1. Standard of Review

We review *de novo* a district court's denial of JMOL pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.[13] Where a jury has rendered a verdict for the non-movant, a court may grant JMOL "only if the court, viewing the evidence in the light most favorable to

---

[12] *Id.* at *20.

[13] *Cash v. Cty. of Erie*, 654 F.3d 324, 332 (2d Cir. 2011).

the non-movant, concludes that a reasonable juror would have been *compelled* to accept the view of the moving party."[14]

"In order for a party to pursue a request for JMOL on appeal, the party must have made timely motions for JMOL in the district court."[15] In particular, a party must first move for JMOL pursuant to Rule 50(a) before the case is submitted to the jury. If the Rule 50(a) motion is denied, "the movant may, no later than 28 days after the entry of a judgment, 'file a *renewed* motion for judgment as a matter of law.'"[16] "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."[17] A district court may grant a Rule 50(b) motion based on a ground not advanced in a Rule 50(a) motion "only if necessary to prevent manifest injustice."[18]

Here, Cortron moved for JMOL both before and after the case was submitted to the jury. The parties disagree, however, about which arguments Cortron preserved in its Rule 50(a) motion. The District Court found that Cortron properly preserved its argument

---

[14] *Id.* at 333 (internal quotation marks omitted) (emphasis in original).

[15] *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).

[16] *Id.* at 153 (quoting Fed. R. Civ. P. 50(b)) (emphasis in *Lore*).

[17] *Id.* (quoting Fed. R. Civ. P. 50 Advisory Comm. Note (2006)) (alteration and emphasis omitted).

[18] *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 127 (2d Cir. 2016) (internal quotation marks omitted).

that MacDermid had failed to prove harm to competition, but that it did not preserve several other arguments raised in its Rule 50(b) motion.[19] Cortron continues to press two of those purportedly unpreserved arguments on appeal: (1) that MacDermid failed to prove lost sales because its case relied on "expert testimony founded on statistically insignificant results";[20] and (2) that the DuPont press release was "commercial speech" that is presumptively harmless under antitrust laws.[21]

We agree with the District Court that Cortron preserved its argument that MacDermid failed to prove harm to competition[22]—a conclusion MacDermid does not challenge on appeal. We therefore consider this argument *de novo.* Because we conclude below that this argument offers a sufficient reason to entitle Cortron to JMOL on the

---

[19] Namely, (1) that MacDermid had failed to prove it was injured because the proof offered was based on a statistical analysis that was insignificant at the 95% confidence interval; (2) that the DuPont press release was presumptively harmless commercial speech; (3) that settling a patent-infringement claim cannot give rise to antitrust liability unless that claim is proved to be baseless; (4) that the procompetitive effects of Cortron's actions outweighed the anticompetitive effects; (5) that MacDermid had failed to prove concerted action between Cortron and DuPont; and (6) that Conn. Gen. Stat. § 35-28 bars only *per se* violations of section 1 of the Sherman Act, and not violations under the "rule of reason."

[20] Cortron Br. 36.

[21] *Id*. at 27.

[22] Cortron preserved this argument following the close of evidence, J.A. 769, and in its renewed motion for JMOL, J.A. 1860–62.

12

antitrust claims, we need not consider whether Cortron preserved its other antitrust arguments.

## 2. The Legal Framework Governing MacDermid's Antitrust Claims

MacDermid's federal and state antitrust claims are identical for purposes of this appeal.[23] Accordingly, we focus here on MacDermid's federal claim, which was brought pursuant to section 1 of the Sherman Act.

Section 1 of the Sherman Act prohibits, in relevant part, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."[24] Under section 1, some restraints on trade, such as horizontal agreements to fix prices, are unlawful *per se*, while others must be evaluated under the so-called "rule of reason."[25] MacDermid alleged that Cortron violated section 1 of the Sherman Act under the rule of reason.

---

[23] *See* Conn. Gen. Stat. § 35-44b ("It is the intent of the General Assembly that in construing [the Connecticut Antitrust Act], the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.").

[24] 15 U.S.C. § 1.

[25] *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007) ("Under [the] rule [of reason], the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. . . . In its design and function the rule distinguishes between restraints with anticompetitive effect that are

A plaintiff seeking to prove an antitrust violation under the rule of reason must initially show that the challenged action adversely affected competition in the relevant market.[26] (Here, the relevant market is thermal flexographic processors.[27]) A plaintiff may satisfy this requirement in either of two ways. First, a plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.[28] Alternatively, a plaintiff may demonstrate an adverse effect indirectly by establishing that the alleged conspirators had sufficient "market power" to cause an adverse effect, "plus some other ground for believing that the challenged behavior" has harmed competition.[29] "Market power" is "defined as the ability of a single seller to raise prices and restrict output."[30]

In *Tops Markets, Inc. v. Quality Markets, Inc.*, we held that a plaintiff seeking to prove an adverse effect indirectly need show only

---

harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." (internal quotation marks omitted)).

[26] *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998).

[27] *See MacDermid Printing Sols., Inc. v. Cortron Corp.*, No. 3:08-CV-1649 (MPS), 2014 WL 2615361, at *4–6 (D. Conn. June 12, 2014).

[28] *See, e.g., Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 547 (2d Cir. 1993).

[29] *See Tops Mkts.*, 142 F.3d at 97.

[30] *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001) (brackets and internal quotation marks omitted).

"that the challenged behavior *could harm* competition."[31] Other Second Circuit cases, however, have required evidence that the challenged behavior *will harm* competition.[32] But despite differences in phrasing, our cases have always required, as a practical matter, some evidence that the challenged action has *already* had an adverse effect on competition, even if consumers have not yet felt that effect.[33]

Indeed, although we have sometimes described "direct" and "indirect" proof as alternative ways of satisfying the adverse-effect requirement, there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market.[34] How "actual harm" is shown determines whether proof of market power is also required. If a

---

[31] 142 F.3d at 97 (emphasis supplied); *see also F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (stating in dicta that "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition").

[32] *See CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 81 (2d Cir. 1999); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995).

[33] *See Tops Mkts.*, 142 F.3d at 97; *see also United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (holding that after demonstrating market power, the government must show that "defendants' actions *have had* substantial adverse effects on competition" (emphasis supplied)).

[34] *See Tops Mkts.*, 142 F.3d at 96, 97 ("[P]laintiff provided no evidence other than market share to prove that defendants' action had an adverse effect on competition. . . . Hence, despite [defendant's] presumed market power, [plaintiff] still failed to show any adverse effect on competition as a whole."); *see also CDC Techs.*, 186 F.3d at 81 (implying that the requirement for proving harm to competition is the same whether or not market power is shown).

15

plaintiff proves that consumers have already experienced harm from the challenged behavior because of higher prices, reduced output, or lower quality, then proof of market power is not required. Otherwise, it is.[35]

Our cases suggest that it is possible, at least in theory, to prove that a challenged action harmed competition without offering evidence of higher prices, reduced output, or reduced quality. We have never explained, however, what such proof would look like. Indeed, in no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality.

We first discussed "indirect" proof in *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*[36] In that case, we suggested that a plaintiff that is unable to prove an actual adverse effect through price, output, or quality "must *at least* establish that defendants possess the requisite market power so that [the challenged action] has the potential for genuine adverse effects on competition."[37] Because the plaintiff in that case failed to prove

---

[35] *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 509 (2d Cir. 2004) ("If plaintiff can demonstrate an actual adverse effect on competition, such as reduced output, there is no need to show market power in addition." (citation omitted)); *K.M.B.*, 61 F.3d at 129.

[36] 996 F.2d 537.

[37] *Id.* at 546 (emphasis supplied) (internal quotation marks omitted).

market power, we had no need to consider what additional evidence of harm to competition might have been required.

We revisited the issue in *K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.*[38] In *K.M.B.*, we emphasized that under the rule of reason, "a showing of market power, while necessary to show adverse effect indirectly, is not sufficient," and that a plaintiff must offer "other grounds to believe that the defendant's behavior will harm competition market-wide."[39] As in *Capital Imaging*, however, we had no cause to decide what "other grounds" might suffice, because the plaintiff offered no reason at all to think that the challenged behavior had harmed or would harm competition.[40]

We did suggest, in dicta, two possible examples of such "other grounds": "the inherent[ly] anticompetitive nature of [a] defendant's behavior or the structure of the interbrand market."[41] We have never had occasion to determine in a precedential opinion, however, in what situations either of these considerations would actually enable a plaintiff to indirectly prove an adverse effect on competition. We have suggested that actions that reduce consumer choice are

---

[38] 61 F.3d 123.

[39] *Id.* at 129.

[40] *Id.* at 129–30.

[41] *Id.* at 129.

17

inherently anticompetitive.[42] We have also suggested that "the structure of the interbrand market" means, in practice, an inquiry into whether the challenged behavior "significantly restrict[ed]" competitors' ability to enter the relevant market and compete—in other words, whether the challenged behavior created significantly higher barriers to entry.[43] In no case, however, have we actually held that proof of market power plus any particular interbrand market structure was sufficient to prove an adverse effect on competition as a whole.

In sum, proving an adverse effect on competition without showing increased price, reduced output, or reduced quality in the market has remained possible in theory but elusive in practice.

---

[42] *See Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 223–24 (2d Cir. 2008). The issue presented in *Ross* was whether plaintiffs had Article III standing; we thus had no reason to make any definitive pronouncement about how to analyze reduction in consumer choice under the rule of reason. *See also Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 n.4 (2d Cir. 2015) (summary order) (declining to reach issue of whether collusion to reduce consumer choice in the circumstances presented constituted an unreasonable restraint on trade). In many cases, of course, "inherently anticompetitive" behavior would likely be deemed illegal *per se* and thus not analyzed under the rule of reason. *Cf. Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused.").

[43] *See Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 59 (2d Cir. 1997) (internal quotation marks omitted); *see also Tops Mkts.*, 142 F.3d at 97 (suggesting that in considering "the structure of the interbrand market," the relevant inquiry was whether the challenged action "foreclose[d] other prospective . . . competitors from entering the market in desirable locations").

### 3. Application

MacDermid sought to prove an antitrust violation under the rule of reason. As such, it was required to prove an adverse effect on competition. It has failed to do so here.

### a. Direct Proof of Competitive Harm

As an initial matter, we agree with the District Court that MacDermid has not directly proved an adverse effect on competition.[44] Although MacDermid contends that the jury could reasonably have found that the purported conspiracy increased prices, MacDermid does not suggest, much less show, that prices for thermal flexographic processors actually rose after DuPont's settlement with Cortron. Instead, MacDermid argues that DuPont would have decreased its prices but for the conspiracy.[45] But this amounts to little more than speculation. To prove an *actual* adverse effect on price, a plaintiff must show just that—that prices actually increased.[46]

---

[44] *See* J.A. 772 (finding "no evidence" that the purported Cortron-DuPont conspiracy resulted in reduced output or higher prices in the market for thermal flexography processors); J.A. 774. MacDermid comes close to conceding this point. *See* MacDermid Br. 23 (criticizing Cortron's "blinkered focus on 'price, quality, and output'").

[45] MacDermid Br. 25–26.

[46] *See Tops Mkts.*, 142 F.3d at 96; *see also Virgin Atl.*, 257 F.3d at 264 (holding that "expert testimony rooted in hypothetical assumptions cannot substitute for actual market data" when showing an actual adverse effect on price).

Nor has MacDermid produced evidence that the purported conspiracy led to reduced output in the market. A reasonable jury could have found that the Cortron-DuPont settlement resulted in MacDermid's losing its critical supplier, which in turn prevented the production of new LAVA machines for about nine months. But while this disruption may have reduced the total number of thermal flexographic processors in the world, it did not reduce the number of such processors *from the perspective of consumers*.[47] During MacDermid's transition from Cortron to OLEC, MacDermid always maintained an inventory of LAVA machines, which always exceeded consumer demand.[48] Accordingly, the production of additional LAVA machines during that time would not have increased, in any meaningful sense, the number of machines that consumers could actually buy.[49]

---

[47] *See Tops Mkts.*, 142 F.3d at 96 ("[E]ven if plaintiff were hindered from competing, nothing changed in the relevant product market from the consumer's perspective."); *Capital Imaging*, 996 F.2d at 547 ("It has not [been] shown that defendants' activities have had any adverse impact on . . . output . . . offered to consumers . . . .").

[48] *See* J.A. 511 (testimony of MacDermid general manager that MacDermid "never was unable to fulfill a sale" due to insufficient inventory).

[49] Our conclusions with respect to price and output reinforce each other. Basic principles of economics teach us that, all things being equal, price and output have an inverse relationship. *See, e.g.*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 324–25 (2007); *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 777 (1999). Therefore, if Cortron's actions had resulted in reduced quantity, they should also have resulted in higher prices, absent some other explanation.

We note, finally, that MacDermid does not argue that the purported conspiracy reduced the overall quality of processors in the market.[50] We turn, then, to indirect evidence of harm to competition.

### b. Indirect Proof of Competitive Harm

As discussed above, to prove harm to competition indirectly, MacDermid was required to show (1) that the conspirators had sufficient "market power" to cause an adverse effect, and (2) "some other ground for believing that the challenged behavior" harmed competition.[51] Even if we assume *arguendo* that MacDermid has proved market power, MacDermid has failed to provide any reason to think that the Cortron-DuPont agreement harmed competition in the market as a whole.

MacDermid offers three possible reasons to believe that Cortron's behavior harmed competition, none of which has merit. First, MacDermid suggests that the Cortron-DuPont settlement "was inherently anticompetitive" because "Cortron and DuPont had a competitive relationship at the time."[52] But as the District Court correctly observed, Cortron and DuPont did not compete for

---

[50] We do not consider MacDermid's bare assertions to the contrary. *See* MacDermid Br. 11, 12, 22; *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).

[51] *Tops Mkts.*, 142 F.3d at 97.

[52] MacDermid Br. 21–22.

customers. Rather, Cortron was an upstream supplier of MacDermid and later of DuPont. Accordingly, the mere fact that Cortron and DuPont reached an agreement was no more inherently anticompetitive than the earlier agreement between Cortron and MacDermid. And although the settlement of patent litigation is not immune from possible antitrust liability, neither is it inherently anticompetitive.[53]

Second, MacDermid argues that "the relevant interbrand market was a duopoly," which "is ground alone for finding [that] the challenged behavior harmed competition."[54] But although "competition is necessarily limited" in a duopoly,[55] the mere fact that a market has few competitors does not transform every action by one of them into an antitrust violation. Rather, even in a duopoly, a plaintiff must offer some other reason to think that the challenged behavior harmed competition.[56]

---

[53] *See F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013) (suggesting that while so-called "reverse payment" settlements of patent litigation can sometimes violate antitrust laws, settling patent litigation without reverse payments is less likely to have impermissible anticompetitive effects).

[54] MacDermid Br. 22.

[55] *See Visa U.S.A.*, 344 F.3d at 240.

[56] *See id.* (finding evidence of harm to competition based on, *inter alia*, evidence of "the total exclusion of [two competitors] from a segment of the market"). One approach might be to show that the challenged behavior resulted in greater barriers to entry. *See CDC Techs.*, 186 F.3d at 80; *ante* note 43 and accompanying text. MacDermid's expert testified at trial that "[t]here are barriers to entry" in the market for thermal flexographic processors, but he did not suggest that the

Finally, MacDermid argues that the Cortron-DuPont conspiracy harmed competition by reducing the range of options available to consumers. MacDermid is correct that reduced consumer choice can constitute harm to competition.[57] But the Cortron-DuPont agreement did not restrict the options available to consumers, who never lost the option of buying LAVA processors.

MacDermid argues, and the District Court found, that the Cortron-DuPont conspiracy—and especially DuPont's press release—could have led "consumers to believe that MacDermid's LAVA technology was no longer available."[58] But even if a press release can rise to the level of "[c]oercive activity that prevents its victims from making free choices between market alternatives"—the standard courts have used in the past when evaluating purported

---

Cortron-DuPont settlement or press release affected those barriers. *See* J.A. 601. Instead, MacDermid used the prior existence of barriers to entry to establish DuPont's market power. *See MacDermid Printing Sols.*, 2015 WL 251527, at *7. MacDermid does not mention barriers to entry on appeal, much less show that the purported conspiracy heightened existing barriers or created new ones.

[57] *See, e.g.*, *Ind. Fed'n of Dentists*, 476 U.S. at 459; *Visa U.S.A.*, 344 F.3d at 240; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect."); *Ross*, 524 F.3d at 224 ("The reduction in choice and diminished quality of credit services to which the cardholders claim they have been subjected are present anti-competitive effects . . . .").

[58] *MacDermid Printing Sols.*, 2015 WL 251527, at *7.

23

limitations on consumer choice[59]—it is clear that the press release at issue here did not prevent any consumer from freely choosing between DuPont and MacDermid processors.

The record shows that customers continued to buy LAVA machines even after July 2008, when DuPont announced its settlement with Cortron and when MacDermid switched suppliers.[60] There is no evidence that even a single customer was actually misled into thinking that LAVA processors were no longer available.[61] That is not surprising: users of thermal flexography are "large sophisticated customers" that are unlikely to be tricked into thinking that a viable supplier no longer exists, especially when it comes to making sizable capital expenditures.[62] And even if the press release did mislead some customers regarding the continued availability of LAVA machines, actions that "merely interfere with the consumer's freedom of choice in deciding" whether to buy a product are

---

[59] *See Associated Gen. Contractors of Cal.*, 459 U.S. at 528.

[60] For instance, James Levinsohn, MacDermid's expert, testified that two customers, Bemis and Exopack, continued to buy LAVA machines after DuPont issued the press release. J.A. 601.

[61] *See* J.A. 769.

[62] *See* J.A. 629; *see also* J.A. 1621 (quoting one LAVA model as costing $99,000 and another model as costing $109,000); J.A. 589 (suggesting that DuPont made $2 million from every processor it sold, including subsequent sales of printing plates).

insufficient to support an antitrust claim, absent any further showing of "demonstrable, anti-competitive impact."[63]

It is certainly possible that the purported Cortron-DuPont conspiracy, including DuPont's press release, led some consumers to buy DuPont machines instead of MacDermid ones. But even if true, that would merely establish harm to MacDermid, not harm to competition in the market as a whole. "[B]ecause the antitrust laws protect competition, not competitors," a plaintiff must show that more than its own business suffered; it must ultimately show that the challenged action harmed consumers.[64] MacDermid has not done so here.[65]

---

[63] *See Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1293 (2d Cir. 1974); *cf. Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/and Am. Home Prods. Corp.*, 850 F.2d 904, 916 (2d Cir. 1988) (holding that, under section 2 of the Sherman Act, "a plaintiff asserting a monopolization claim based on misleading advertising must overcome a presumption that the effect on competition of such a practice was *de minimis*" (internal quotation marks omitted)).

[64] *Clorox Co.*, 117 F.3d at 57; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*[.]'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))).

[65] Because we hold that Cortron is entitled to judgment as a matter of law on MacDermid's antitrust claims, we need not consider Cortron's alternative request for a new trial or its argument that the jury awarded duplicative antitrust damages.

### B. Admission of Evidence Concerning MacDermid's Patent Advice

We next consider Cortron's argument that the District Court "abused its discretion" in permitting MacDermid to present evidence of its patent counsel's advice, which it had previously withheld based on claims of attorney-client privilege and the work-product doctrine.

#### 1. Background

The events leading to this appeal began with a patent-infringement suit filed by DuPont, alleging that Cortron's work for MacDermid had infringed DuPont's '454 patent. Whether Cortron or MacDermid has, in fact, infringed any DuPont patent is not directly at issue in this litigation.[66] Nonetheless, the question of infringement lurks beneath several of the claims in this suit. Of particular relevance to this appeal, evidence of infringement could have provided Cortron with a defense against MacDermid's breach-of-contract claim: Cortron argues that MacDermid had warranted that LAVA infringed no third-party patent, and that any infringement of

---

[66] MacDermid challenged the validity of the '454 patent in a separate proceeding before the U.S. Patent and Trademark Office. *See MacDermid Printing Sols., LLC v. E.I. DuPont de Nemours & Co.*, No. 2015-1750, 2016 WL 1042927 (Fed. Cir. Mar. 16, 2016). In addition, DuPont sued MacDermid in the District of Connecticut for patent infringement. DuPont and Cortron both moved to consolidate that action with the instant litigation, but MacDermid opposed consolidation and moved to transfer DuPont's suit to the District of New Jersey, where other litigation was pending between MacDermid and DuPont. The District Court granted MacDermid's motion to transfer and denied the motions to consolidate as moot.

the '454 patent therefore constituted a breach of warranty by MacDermid.[67]

Accordingly, during discovery in 2009, Cortron sought evidence, through document requests, interrogatories, and depositions, about MacDermid's efforts to determine whether its LAVA machines infringed any DuPont patent. MacDermid initially resisted some of these discovery requests by invoking the attorney-client privilege and the work-product doctrine.

In September 2012, however, the United States District Court for the District of New Jersey held, in related litigation between DuPont and MacDermid, that MacDermid had waived any privileges regarding the advice of its patent counsel about the design of LAVA

---

[67] *See MacDermid Printing Sols.*, 2014 WL 3943629, at *1 (explaining why the District Court granted MacDermid JMOL on the issue of "whether MacDermid fraudulently and negligently represented that its technology did not infringe a patent held by a third party").

The question of infringement was also potentially relevant to MacDermid's antitrust claims. Cortron essentially argued that if DuPont had an objective basis for thinking that LAVA infringed the '454 patent, then DuPont's patent-infringement suit against Cortron was not an anticompetitive sham that violated federal and state antitrust laws. *See Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51, 61 (1993) (holding that patent litigation is generally immune from antitrust liability as long as it is not (1) "objectively baseless" and (2) subjectively intended "as an anticompetitive weapon" (internal quotation marks omitted)). Because we hold that MacDermid's antitrust claim fails as a matter of law on other grounds, we need not consider whether DuPont's suit was objectively baseless. *See also ante* note 19 (discussing whether Cortron waived this argument).

machines and their potential infringement of DuPont patents. In response to that ruling, MacDermid supplemented its production of documents in the instant litigation and amended its exhibit and witness lists. Included among MacDermid's new proposed exhibits was an opinion by the law firm of Wiggin & Dana LLP stating that LAVA processors did not infringe DuPont's '454 patent.

On September 6, 2013, Cortron filed a motion *in limine* to preclude MacDermid from presenting the newly disclosed evidence. The District Court granted the motion in part and denied it in part in an order of June 4, 2014.[68] The court excluded the Wiggin & Dana opinion, as well as any opinion testimony that MacDermid did not actually infringe the '454 patent, but permitted testimony by John Cordani (MacDermid's general counsel)[69] and other witnesses concerning MacDermid's efforts to avoid infringement.

To avoid prejudicing Cortron, the District Court permitted Cortron to engage in additional discovery in response to MacDermid's newly disclosed evidence.[70] Specifically, the court ordered MacDermid to supplement its interrogatory response and

[68] When Cortron filed its motion, the trial was scheduled to begin on October 15, 2013. The trial actually began on June 18, 2014.

[69] John L. Cordani, MacDermid's general counsel and secretary, is not to be confused with John L. Cordani, Jr., an attorney for Carmody Torrance Sandak & Hennessey LLP, who appears on MacDermid's brief.

[70] Although the court decided Cortron's motion *in limine* on June 4, 2014, the court had indicated during a telephonic status conference on May 28, 2014, that it was inclined to authorize additional discovery. Special App. 1.

28

document production and permitted Cortron to re-depose several witnesses.[71] The District Court also permitted Cortron to designate an expert on the issue of whether MacDermid had given Wiggin & Dana enough information to render an adequately informed patent opinion.

Pursuant to the District Court's order, MacDermid supplemented its interrogatory response, and Cortron re-deposed four witnesses between June 6 and June 13, 2014. MacDermid also provided Cortron with a transcript of an earlier deposition of Cordani in New Jersey. Cortron declined to designate an expert on the subject of infringement.

### 2. Analysis

A party challenging a district court's evidentiary ruling is generally entitled to a new trial if (1) "the district court committed errors that were a clear abuse of discretion," and (2) those errors "were clearly prejudicial to the outcome of the trial, where prejudice is measured by assessing the error in light of the record as a whole."[72]

---

[71] In particular, the District Court permitted additional depositions of Cordani; James Hennessy, an engineer at MacDermid; Ryan Vest, MacDermid's director of research and development; and a witness from OLEC. The District Court noted that MacDermid had already given Cortron an opportunity to depose Cordani, and perhaps also Hennessy and Vest, in September 2013.

[72] *Marshall v. Randall*, 719 F.3d 113, 116 (2d Cir. 2013) (internal quotation marks omitted). As we have often observed, "abuse of discretion" is a "term of art" that "merely signifies that a district court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision

"In civil cases, the burden falls on the appellant to show that the error was not harmless and that it is likely that in some material respect the factfinder's judgment was swayed by the error."[73]

Cortron has not met this burden. First, Cortron has not even shown that the District Court erred, much less "abused its discretion," in admitting the challenged evidence. We have generally been reluctant to second-guess a district court's decision whether to exclude evidence previously withheld as privileged.[74] Although Cortron cites several cases suggesting that the District Court would have been *permitted* to exclude the challenged evidence, none suggests that exclusion was *required*.[75] Indeed, we have encouraged

that cannot be located within the range of permissible decisions." *Barrella*, 814 F.3d at 611 (internal quotation marks omitted).

[73] *Warren v. Pataki*, 823 F.3d 125, 138 (2d Cir. 2016) (internal quotation marks omitted).

[74] *Cf. United States v. 4003–4005 5th Ave., Brooklyn, NY*, 55 F.3d 78, 85 (2d Cir. 1995) (noting, in the context of the privilege against self-incrimination, that "as long as a trial court considers the relevant factors and acts with moderation to accommodate both a litigant's valid [privilege] interests and the opposing parties' needs in having the litigation conducted fairly, we will not disturb the measures used by that court in the exercise of its discretion.").

[75] *See, e.g., id.* at 85 (holding that a district court did not abuse its discretion by precluding the submission of evidence previously claimed to be within the privilege against self-incrimination); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) ("The district court was also within its discretion in excluding evidence of [defendant's] reliance on advice of counsel."). Cortron argues that Federal Rule of Civil Procedure 37(c)(1) mandated the exclusion of certain evidence because MacDermid did not timely supplement its responses to Cortron's interrogatories and production requests.

district courts to "take a liberal view" toward the withdrawal of a claim of privilege, which "allows adjudication based on consideration of all the material facts."[76]

A district court "may be fully entitled" to preclude the presentation of evidence "about matters previously hidden from discovery through an invocation of" privilege, if a party has manipulated the privilege "primarily to abuse, manipulate or gain an unfair strategic advantage over opposing parties."[77] Here, however, we agree with the District Court that MacDermid did not proceed in bad faith. To the contrary, MacDermid vigorously defended its privilege until the United States District Court for the District of New Jersey made a finding of waiver over MacDermid's objection. MacDermid then promptly sought to introduce the newly unprivileged evidence in the instant litigation.

Nor has Cortron shown that it was prejudiced by the District Court's ruling. Cortron had ample opportunity to respond to MacDermid's late disclosures and to prepare to rebut the newly produced evidence at trial. MacDermid invited Cortron in September 2013—eight months before the evidentiary ruling at issue here—to depose Cordani on the questions as to which MacDermid had

---

But we have rejected the view that Rule 37(c)(1) invariably requires exclusion. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297–98 (2d Cir. 2006).

[76] *4003–4005 5th Ave.*, 55 F.3d at 84.

[77] *Id.* at 84–85.

previously asserted a privilege. Cortron declined to do so. After the District Court's ruling of June 4, 2014, Cortron re-deposed Cordani and three other witnesses, and MacDermid supplemented its relevant interrogatory response. The District Court also offered Cortron an opportunity to designate an expert on patent validity, but Cortron declined to do that as well. Moreover, Cortron rejected an opportunity to pursue a continuance.[78] Cortron must bear the consequences of these tactical decisions.[79]

### C. Denial of Remittitur or New Trial on CUTSA Damages

Finally, we consider Cortron's argument that the jury's award of $3,790,939 for damages under CUTSA was excessive, and that the District Court therefore should have remitted the award or ordered a new trial on CUTSA damages.

We review for "abuse of discretion" a district court's denial of remittitur or a new trial on damages.[80] "In considering motions for a new trial and/or remittitur, the role of the district court is to

---

[78] *Cf. Manley v. AmBase Corp.*, 337 F.3d 237, 247 n.7 (2d Cir. 2003) ("Although [appellant] complains that [appellee's] motion to preclude the use of [a] discovery deposition was not made until the eve of the second trial, the record fails to evidence prejudice, particularly since [appellant] did not seek a continuance . . . ."); *United States v. Andrews*, 381 F.2d 377, 378 (2d Cir. 1967) ("If . . . appellant . . . was surprised by the . . . evidence, his proper remedy would have been to seek a continuance . . . .").

[79] *See Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) ("We are disinclined . . . to facilitate a new trial in which the defense can repair a tactical error.").

[80] *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 126 (2d Cir. 2014).

determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered."[81]

Under Connecticut law, "the relevant inquiry" in determining whether an award is excessive is whether it "falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion that it was due to partiality, prejudice or mistake."[82] Damages may also be excessive under Connecticut law "when the record, viewed in the light most favorable to the plaintiff, does not support the jury's award."[83]

Cortron argues that the jury's award of damages under CUTSA lacked an evidentiary basis. MacDermid's CUTSA claim derived from Cortron's transfer to DuPont of technical information for LAVA machines. The jury's award of damages was based on an estimate by MacDermid's expert, James Levinsohn, of the amount Cortron and MacDermid would have agreed Cortron would pay in a

---

[81] *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (brackets and internal quotation marks omitted).

[82] *Duncan v. Mill Mgmt. Co. of Greenwich*, 60 A.3d 222, 244 (Conn. 2013) (internal quotation marks omitted); *accord Munn v. Hotchkiss Sch.*, 795 F.3d 324, 335 (2d Cir. 2015).

[83] *Duncan*, 60 A.3d at 244.

"hypothetical negotiation" for the right to give DuPont that information.

Cortron does not challenge Levinsohn's use of a hypothetical negotiation to estimate CUTSA damages.[84] Rather, Cortron argues that Levinsohn's estimate was too speculative to support the jury's award. In particular, Cortron argues that, in any hypothetical negotiation, it would have paid MacDermid "no more than the amount for which" Cortron could have resold the technical information to DuPont.[85] The record, Cortron maintains, is devoid of any information suggesting what that amount might have been, especially since—according to Cortron—DuPont had "no use" for technical information about existing LAVA machines, which were inferior to DuPont's own FAST processors.[86] At most, Cortron argues, DuPont would have paid no more than what it would have cost to

---

[84] An award based on a "hypothetical negotiation," also known as a "reasonable royalty," is common "in both trade secret and patent cases." *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 450 (2d Cir. 1998). Connecticut courts have not resolved whether this methodology is compatible with CUTSA. *Compare MacDermid, Inc. v. Cookson Grp., PLC*, No. X10UWYCV095014518, 2014 WL 7525513, at *6–8 (Conn. Super. Ct. Nov. 21, 2014), *with Evans v. Gen. Motors Corp.*, No. X06CV940156090S, 2003 WL 21040255 (Conn. Super. Ct. Apr. 22, 2003). Because Cortron does not suggest otherwise, we assume without deciding that CUTSA permits a "hypothetical negotiation" methodology.

[85] Cortron Br. 63.

[86] *Id.*

obtain the information by reverse-engineering a LAVA processor—a process that would have cost less than $30,000.[87]

Under Connecticut law, a jury is entitled to award damages that are based on an expert's estimate, especially when that estimate is based on calculations that have been explained to the jury.[88] Although Cortron contested the accuracy and reliability of Levinsohn's approach, his estimate was based on evidence in the record, which the jury had ample opportunity to evaluate. In particular, Levinsohn testified that MacDermid had spent about $3.8 million to develop the technical information underlying its first generation of LAVA machines;[89] MacDermid's general manager, Timothy Gotsick, offered a similar figure.[90] That testimony, viewed in the light most favorable to MacDermid, was sufficient to support a finding that MacDermid would not have sold its technical information to Cortron (for resale to DuPont) for less than that amount, and that the amount therefore reflects what MacDermid and Cortron would have agreed to in a hypothetical negotiation.

---

[87] *Id.* at 63–64.

[88] *See Duncan*, 60 A.3d at 245–46; *cf. Earlington v. Anastasi,* 976 A.2d 689, 698 (Conn. 2009) (holding that the trial court improperly denied remittitur when the jury awarded damages that were more than 50 percent greater than what the plaintiff's expert had calculated).

[89] J.A. 589.

[90] J.A. 723.

We therefore conclude that the District Court did not err, much less "abuse its discretion," in allowing the jury's award to stand.

## III. CONCLUSION

To summarize, we hold as follows:

(1) MacDermid failed to prove harm to competition. The District Court therefore erred in rejecting Cortron's Rule 50(b) motion for judgment as a matter of law on MacDermid's antitrust claims.

    a. Under section 1 of the Sherman Act, as well as corresponding Connecticut law, a plaintiff seeking to prove an antitrust violation under the so-called "rule of reason" must initially show that the challenged action has adversely affected competition in the market as a whole.

    b. A plaintiff may prove an adverse effect on competition either directly (by offering evidence of higher prices, lower output, or reduced quality in the relevant market) or indirectly (by showing that the defendant exercised "market power" in the relevant market, as well as some other ground for believing that the challenged behavior has harmed competition).

    c. MacDermid has failed to show that Cortron's actions harmed competition in the market as a whole.

i. MacDermid has not shown that the alleged Cortron-DuPont conspiracy affected prices, output, or quality in the market.

ii. MacDermid has not proved that the alleged Cortron-DuPont conspiracy reduced the range of choices available to consumers or harmed consumers in any other way.

(2) The District Court did not "abuse its discretion" in permitting MacDermid to introduce evidence previously withheld under the attorney-client privilege and the work-product doctrine.

(3) The District Court did not "abuse its discretion" in denying remittitur or a new trial on damages on MacDermid's state-law claim for misappropriation of trade secrets.

For the foregoing reasons, we **REVERSE** the judgment of the District Court insofar as it denied Cortron's post-verdict motion for judgment as a matter of law on MacDermid's antitrust claims. We otherwise **AFFIRM** the judgment of the District Court, leaving undisturbed the award of damages on MacDermid's state-law claims for misappropriation of trade secrets, unfair trade practices, computer crimes, and breach of contract. We **REMAND** the cause to the District Court to recalculate damages in a manner consistent with this opinion.