Davis v. HCA Healthcare, Inc., 2022 NCBC 52.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

WILLIAM ALAN DAVIS;
LORRAINE NASH, as Administrator
of the Estate of RICHARD NASH;
WILL OVERFELT, Ed.S BCBA;
JONATHAN POWELL; FAITH C.
COOK, Psy.D.; and
KATHERINE BUTTON, on their own
behalf and on behalf of all others
similarly situated,

Plaintiffs,

v.

HCA HEALTHCARE, INC.; HCA
MANAGEMENT SERVICES, LP;
HCA, INC.; MH MASTER
HOLDINGS, LLLP; MH HOSPITAL
MANAGER, LLC; MH MISSION
HOSPITAL, LLLP; ANC
HEALTHCARE, INC. F/K/A
MISSION HEALTH SYSTEM, INC.;
and MISSION HOSPITAL, INC.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 3276

ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS

THIS MATTER comes before the Court on Defendants' Motion to Dismiss Class Action Complaint ("Motion to Dismiss" or "Motion," ECF No. 27).

THE COURT, having considered the Motion, the briefs of the parties, the arguments of counsel, and all appropriate matters of record, **CONCLUDES**, for the reasons set forth below, that the Motion should be **GRANTED**, in part, and **DENIED**, in part.

*Wallace and Graham, P.A., by John Hughes and Mona Lisa Wallace, and Fairmark Partners, LLP, by Jamie Crooks for Plaintiffs William Alan Davis, Lorraine Nash, as Administrator of the Estate of Richard Nash, Will Overfelt, Ed.S. BCBA, Jonathan Powell, Faith C. Cook, Psy D., and Katherine Button, on their own behalf and on behalf of all others similarly situated.*

*Roberts & Stevens, P.A., by Phillip T. Jackson, John Noor, and David Hawisher, and Simpson Thatcher & Bartlett LLP, by Sara Razi and Abram Ellis, for Defendants HCA Healthcare, Inc., HCA Management Services, LP, HCA, Inc., MH Master Holdings, LLLP, MH Hospital Manager, LLC, and MH Mission Hospital, LLLP.*

*Bradley Arant Boult Cummings LLP, by Dana C. Lumsden and Dexter C. Hobbs, Jr., and Faegre Drinker Biddle & Reath LLP, by Kenneth M. Vorrasi, Jonathan H. Todt, Alison M. Agnew, and Paul H. Saint-Antoine for Defendants ANC Healthcare, Inc. f/k/a Mission Health System Inc. and Mission Hospital, Inc.*

Davis, Judge.

## INTRODUCTION

1.     This case presents several unique issues arising under antitrust law with regard to the provision of healthcare services in western North Carolina. Plaintiffs allege that (1) Defendants possess a monopoly with regard to the provision of inpatient medical services in the Asheville area though their flagship hospital; (2) Defendants have unlawfully sought to maintain and extend that monopoly into adjacent counties by coercing commercial health insurers into including Defendants' other smaller facilities in their "networks"; and (3) by virtue of such practices, Defendants have also engaged in an unlawful restraint of trade.  Defendants, conversely, contend that (1) any existing monopoly that they possess in the Asheville area for inpatient medical services was lawfully acquired; and (2) Plaintiffs have failed to adequately plead in their Complaint valid claims for monopolization, attempted monopolization, or restraint of trade.  In evaluating the parties' competing positions, the Court must apply antitrust principles within the specific context of the healthcare industry in which patients largely pay for medical care in the form of

premiums paid to commercial health insurers, which negotiate directly with hospitals for inclusion within the insurers' networks.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached, referred to, or incorporated by reference in the complaint) that are relevant to the Court's determination of the motion. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681 (1986); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

### A. Parties

3. The named Plaintiffs in this action are all residents of western North Carolina who each have health insurance under some form of commercial insurance plan. (Complaint, ECF No. 3, ¶¶ 15–20.) The Complaint alleges that as a result of Defendants' antitrust violations, each Plaintiff has had to pay "higher amounts" for healthcare services. (Compl. ¶¶ 15–20.)

4. Defendant HCA Healthcare, Inc. ("HCA") "is the ultimate parent company of the HCA enterprise" and is "the world's largest for-profit hospital chain." (Compl. ¶¶ 21–23.) HCA operates through a web of affiliated entities, including the following Defendants: HCA Management Services, LP; MH Master Holdings, LLLP; MH Hospital Manager, LLC; and MH Mission Hospital, LLLP. (Comp. ¶¶ 21–41.)

5. Defendant ANC Healthcare, Inc. f/k/a Mission Health System Inc. ("ANC") was incorporated in 1981 as a North Carolina nonprofit corporation and operated healthcare systems in Western North Carolina. (Compl. ¶¶ 43–44.) Although the company still exists, it has not been based in North Carolina since 2019. (Compl. ¶ 42.)

6. Defendant Mission Hospital, Inc. ("Mission) similarly operated in North Carolina until 2019. Both Mission and ANC now have principal places of business in Florida. (Compl. ¶¶ 42, 46.) Mission was incorporated in 1951 as a North Carolina nonprofit corporation. (Compl. ¶ 47.)[1]

## B. Relevant Markets

7. Plaintiffs identify three distinct geographic markets relevant to the antitrust claims asserted in the Complaint.[2]

8. Plaintiffs assert that the first relevant market—the "Primary Relevant Market"— is the Asheville Region Inpatient Services market. Plaintiffs describe this market as "the sale of inpatient general acute care hospital services to insurers (or self-funded [third-party administrator]s) in Buncombe and Madison Counties[.]" (Compl. ¶ 111.) Plaintiffs allege that "Defendants participate in the Asheville Region Inpatient Services Market predominately through their flagship facility, Mission Hospital-Asheville." (Compl. ¶ 111.)

---

[1] The named Defendants in this case are referred to collectively herein as "Defendants."

[2] For purposes of the present Motion, Defendants have not challenged the validity of Plaintiffs' designation of these markets.

9.      In the Asheville Region Inpatient Services market, Defendants possess a market share of approximately 80-90% for acute inpatient services. (Compl. ¶ 116.) According to the Complaint, this market share is "significant enough to stifle competition and restrict freedom of commerce, and, during the relevant period, Defendants have had the ability to control the price for this market." (Compl. ¶ 116.)

10.      The second relevant market identified by Plaintiffs is "the sale of outpatient medical services to insurers in Buncombe and Madison Counties," which the Complaint refers to as the Asheville Region Outpatient Services market. (Compl. ¶ 117.) Plaintiffs assert that "Defendants participate in this market through their flagship facility, Mission Hospital-Asheville, and other HCA/Mission outpatient facilities in Buncombe and Madison Counties." (Compl. ¶ 117.) The Complaint does not provide any market share data for the Asheville Region Outpatient Services market but nevertheless alleges that "Defendants are able to control the prices paid by commercial health plans and patients" in this market. (Compl. ¶ 129.)

11.      The third, and final, relevant market Plaintiffs identify is the "Outlying Regions Inpatient and Outpatient Services Market."[3] Plaintiffs allege that "[u]nlike Mission Hospital-Asheville, several of these Outlying Facilities face some competition for acute inpatient hospital services and compared to Mission Hospital-Asheville they face more significant competition for outpatient medical services, from other hospitals and non-hospital providers in the geographic regions in which they operate." (Compl. ¶ 127.)

---

[3] Plaintiffs assert that this market comprises Macon, McDowell, Mitchell, Transylvania, and Yancey Counties. (Compl. ¶ 126.)

12.     Defendants' allegations regarding Defendants' market share in the Outlying Regions relates solely to inpatient services.  (Compl. ¶ 131.)  Plaintiffs provide the following market share figures for inpatient services in the counties comprising the Outlying Regions using data from 2018:[4]

Macon County: 74.4%

McDowell County: 76.4%

Mitchell County: 85.4%

Transylvania County: 78.7%

Yancy County: 90.9%

(Compl. ¶ 225.)

### C. Mission's Acquisition of Asheville Monopoly

13.     The origins of this lawsuit stem from the operation of Mission Hospital in Asheville, North Carolina.  (Compl. ¶ 57.)  After joining with other Buncombe County hospitals after World War II, Mission became a "major medical center" in western North Carolina.  (Compl. ¶ 58.)  As noted, Mission Hospital, Inc. was incorporated in 1951.  (Compl. ¶ 58.)

14.      In the 1990s, following Mission's growth as a major hospital in western North Carolina, Mission initiated lobbying efforts to persuade the North Carolina General Assembly to enact a Certificate of Public Advantage ("COPA") law[5] to

---

[4] As discussed in more detail later in this Opinion, these figures are largely, if not entirely, based on Medicare data.

[5] A COPA is essentially an agreement between a private entity and a state in which the entity is granted a legal monopoly in a particular market in exchange for agreeing to be subject to certain types of oversight from the state.  (Compl. ¶ 63.)

encourage cooperation between Mission Hospital and St. Joseph's Hospital, the only two private acute care hospitals in Asheville at that time.  (Compl. ¶ 59.)

15.     These lobbying efforts were successful, and in 1993 an initial version of the COPA law was enacted that sought to immunize Mission from antitrust scrutiny. (Compl. ¶ 59; 1993 N.C. Sess. Laws 529.)  The General Assembly stated the following regarding the underlying purpose of the law:

> [F]ederal and State antitrust laws may prohibit or discourage cooperative arrangements that are beneficial to North Carolina citizens despite their potential for or actual reduction in competition and . . . such agreements should be permitted and encouraged.

N.C.G.S. § 131E-192.1(7) (1997) (repealed 2015).

16.     The operative portion of the COPA law stated as follows:

> (a) Activities conducted pursuant to a cooperative agreement for which a certificate of public advantage has been issued are immunized from challenge or scrutiny under State antitrust laws.  In addition, conduct in negotiating and entering into a cooperative agreement for which an application for a certificate of public advantage is filed in good faith shall be immune from challenge or scrutiny under State antitrust laws, regardless of whether a certificate is issued.  It is the intention of the General Assembly that this Article shall also immunize covered activities from challenge or scrutiny under federal antitrust laws.

N.C.G.S. § 131E-192.13(a) (2013) (repealed 2015).

17.     In the Complaint, Plaintiffs summarize the effect of the COPA law as follows: "Effectively, the government and Mission had a deal: If Mission accepted regulation to prevent it from charging monopoly prices or otherwise abusing its monopoly market power, North Carolina would exempt Mission from the antitrust laws." (Compl. ¶ 63.)

18.     In response to FTC antitrust concerns, the COPA law was amended in 1995, after which Mission entered into a partnership with St. Joseph's Hospital. (Compl. ¶¶ 60–61.)  The COPA law was amended once more in 1998 to facilitate a formal merger between Mission and St. Joseph's Hospital, resulting in the Mission Health System.  (Compl. ¶¶ 60–61)  The COPA law was again amended in 2006. (Compl. ¶ 67.)  Plaintiffs assert that in reliance upon the COPA law, Mission established a pattern of buying up and eliminating physician groups.  (Compl. ¶ 72.)

19.     In the early 2010s, Mission officials began complaining about the state oversight provided for under the COPA law.  Plaintiffs allege that "[a]fter years of pressure by [Mission's CEO]," the General Assembly enacted a bill repealing the COPA law, "terminating state oversight" on 30 September 2016.  (Compl. ¶¶ 78–81.)

20.     Following the COPA law's repeal, Mission was freed of state regulatory oversight and began to negotiate with HCA, a for-profit, multi-state healthcare system.  (Compl. ¶ 84.)  HCA's acquisition of the Mission system was announced in March 2018, and a series of Asset Purchase Agreements were executed in 2018 and 2019.  (Compl. ¶¶ 84.)

**D. Defendants' Acts Post-HCA Acquisition**

21.     According to the Complaint, hospitals such as those under Defendants' control negotiate with insurers not on a "service-by-service basis" but rather for a bundle of services in order to be considered "in-network" with a particular commercial insurer.  (Compl. ¶ 99.)  The costs paid by the commercial health insurer to the hospital for patient services is indirectly passed on to consumers in the form of

premiums paid by consumers as part of their commercial health insurance plan. (Compl. ¶ 102.) In order for a commercial insurer's insurance plan to be viable, the insurer must offer in-network services within the region where patients live or work. (Compl. ¶ 101.) Plans that do not include a comprehensive set of services, or that require long-distance travel by patients in order to receive in-network care, are not viable insurance products. (Compl. ¶ 101.)

22. Plaintiffs allege that when an insurer seeks to offer a health insurance plan "in a region where a significant area is controlled by a single hospital," the dynamics are different—that is, the hospital becomes a "must-have" hospital. As a result, Plaintiffs assert, "must have" hospitals enjoy significant advantages over other healthcare providers in negotiations with commercial insurers.[6] Such hospitals are able to effectively demand higher prices for services than those that would exist in a competitive market featuring significant competition from other healthcare providers. (Compl. ¶¶ 105–06)

23. Plaintiffs allege that this unique advantage in the marketplace has been accompanied by certain "anticompetitive negotiating tactics [by Defendants] with commercial health plans and/or [that Defendants] have insisted on contractual terms including one or more anticompetitive provisions for the insurers." (Compl. ¶ 133.) Such tactics and clauses include tying ("all-or nothing") restrictions, "gag" clauses, and anti-tiering and anti-steering provisions. (Compl. ¶ 133.)

---

[6] In western North Carolina, this means that any commercial health insurance plan in Defendants' operating region that does not include Mission Hospital-Asheville in-network is a non-viable insurance plan in the region served by that hospital.

24.     Plaintiffs allege that Defendants have engaged in an unlawful "tying scheme," which occurs when a monopolist in one market uses its leverage stemming from the monopoly to "reap profits in another market."  (Compl. ¶ 200.)  Plaintiffs describe the classic example of an "all-or nothing" tying agreement in this context as occurring when, during negotiations with an insurer, a hospital system (such as Mission) demands that in order for the insurer to be able to include the system's "must have" hospital in its network, the insurer must agree to include *other* facilities owned by the hospital system in the network—regardless of whether the insurer wants to include those other facilities.  As a result, Plaintiffs argue that the insurer is coerced into including facilities in its network that it does not believe are beneficial to its patients based on factors such as price or quality.  Otherwise, the insurer's network is essentially rendered useless by virtue of its inability to offer the "must have" hospital in-network.  (Compl. ¶ 201.)

25.     Plaintiffs allege that (1) Mission Hospital-Asheville is the epitome of such a "must-have" hospital in western North Carolina for the provision of inpatient services; and (2) through the use of a tying provision in its contracts with commercial health insurers, Defendants are able to coerce those insurers into including other facilities owned by Defendants in their networks— regardless of whether the insurers would otherwise choose not to include these additional facilities in-network.  (Compl. ¶ 202.)

26.     Plaintiffs also assert that in their contracts with insurers Defendants "required one or more insurers not to use steering or tiering language, or to use

weaker language or provisions than the insurers would have desired to use, as a condition of obtaining access to Defendants' 'must have' Mission Hospital-Asheville for their commercial health plan." (Compl. ¶ 229.) According to Plaintiffs, insurers engage in "steering" when they direct patients to seek care at certain facilities that offer more cost-effective or higher-quality care than other facilities. (Compl. ¶ 226.) Plaintiffs further allege that insurers in a competitive market may also engage in "tiering" by creating tiers within a health insurance plan to incentivize their patients to seek care at more cost-effective facilities and to discourage them from utilizing facilities that are more expensive. (Compl. ¶ 227.) Plaintiffs contend that anti-steering and anti-tiering contractual provisions therefore eliminate an insurer's otherwise existing ability to encourage the use of facilities that are less expensive. (Compl. ¶ 227.)

27.     The Complaint also asserts that Defendants "have obscured their price increases and anticompetitive contracts from regulators and the public through use of gag clauses that prevent insurers from revealing their agreements' terms." (Compl. ¶ 231.) Plaintiffs state such clauses have the effect of "prevent[ing] competitors, insurers, and consumers from understanding in a transparent manner the pricing and other terms and arrangements being used by Defendants." (Compl. ¶ 231.)

28.     Overall, Plaintiffs allege that the practices described above have caused anticompetitive harm in the following respects:

- protecting Defendants' market power and enabling Defendants to raise prices and reduce quality of acute inpatient hospital services substantially beyond what would be tolerated in a competitive market, to the detriment of consumer welfare;

- substantially lessening competition among providers in their sale of acute inpatient services;
- preventing the entry of competitors into the market by forcing insurers to agree to terms that bar them from sharing competitive pricing information;
- preventing the entry of potential competitors into the market by forcing insurers to agree to terms that bar them from directing consumers to lower cost providers;
- restricting the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for acute inpatient hospital services;
- reducing consumers' incentives and ability to seek or even be aware of acute inpatient hospital services from more cost-effective providers; and
- depriving consumers of the benefits of a competitive market for their purchase of inpatient hospital services.

(Compl. ¶ 134.)

29. Plaintiffs allege that as a result of the above-referenced practices, insurance premiums in areas where Defendants operate are substantially higher than those in surrounding areas. (Compl. ¶ 235.)

30. In addition, the Complaint alleges that Defendants required patients to undergo unnecessary procedures and pushed patients toward more expensive care. Plaintiffs assert that such conduct would not occur in a competitive healthcare market involving an arms-length bargaining process between insurers and healthcare facilities. (Compl. ¶¶ 193–98.)

31. The Complaint further asserts that "Defendants' monopolistic practices have caused reduced quality of service in HCA/Mission hospitals." In particular, Plaintiffs allege that after its acquisition by HCA, Mission Hospital-Asheville's rating was downgraded from an "A" to a "B" based on "infections, high-risk baby deliveries, some cancer treatment procedures, and the patient experience regarding elective

surgeries." (Compl. ¶¶ 89, 94.) According to the Complaint, Mission was also downgraded by Centers for Medicare and Medicaid Services ("CMS"), and "CMS even threatened to terminate its contract with HCA/Mission over patient safety concerns[.]" (Compl. ¶ 95.)

32. Finally, Plaintiffs allege "[o]n information and belief, because of Defendants' Inpatient/Outpatient Tying Scheme, outpatient facilities have closed or relocated to more competitive markets and would-be competitors for outpatient care have declined to operate in Buncombe and Madison Counties, which has decreased the quantity of outpatient care and increased prices[.]" (Compl. ¶ 205.)

**E. Lawsuit**

33. On 10 August 2021, Plaintiffs filed this action in Buncombe County Superior Court. (Class Action Complaint, ECF No. 3.) Plaintiffs have asserted the following claims: (1) monopolization in violation of Article I, Section 34 of the North Carolina Constitution and N.C.GS. § 75-2.1; (2) attempted monopolization in violation of N.C.G.S. § 75-2.1; and (3) restraint of trade in violation of N.C.G.S. §§ 75-1 and 75-2.[7] As relief, Plaintiffs seek monetary damages along with injunctive, equitable, and declaratory relief. (Compl. ¶¶ 299–345.)

34. This action was designated a mandatory complex business case on 11 August 2021. (ECF Nos. 1, 2.) On 13 October 2021, Defendants filed a Motion to Dismiss pursuant to N.C. R. Civ. P. 12(b)(1) and 12(b)(6) seeking dismissal of each of

---

[7] All of Plaintiffs' claims are based on North Carolina law. However, as noted below, in analyzing these claims it is permissible for the Court to consider federal antitrust cases that it deems to be instructive.

Plaintiffs' asserted claims for relief. (ECF No. 27.) After the case was reassigned to the undersigned on 3 January 2022, (ECF No. 32), the Court held a hearing on 27 April 2022 and a supplemental hearing via WebEx on 17 August 2022. The Motion to Dismiss is now ripe for decision.

## LEGAL STANDARD

35. Defendants' Motion to Dismiss has two components. First, they assert that the named Plaintiffs lack standing to bring this action such that dismissal for lack of subject matter jurisdiction is appropriate under Rule 12(b)(1) of the North Carolina Rules of Civil Procedure. Second, they contend that Plaintiffs have failed to state a valid claim for relief pursuant to Rule 12(b)(6).

36. "A plaintiff's standing to assert its claims may be challenged under either Rule 12(b)(1) or Rule 12(b)(6) of the North Carolina Rules of Civil Procedure." *Raja v. Patel*, 2017 NCBC LEXIS 25, at *11 (N.C. Super. Ct. Mar. 23, 2017) (citations omitted). A Rule 12(b)(1) motion challenges a court's "jurisdiction over the subject matter" of the plaintiff's claims. N.C. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest," *In re T.R.P.*, 360 N.C. 588, 590 (2006) (citation omitted), and "has been defined as the power to hear and to determine a legal controversy; to inquire into the facts, apply the law, and to render and enforce a judgment," *High v. Pearce*, 220 N.C. 266, 271 (1941) (cleaned up). "[T]he proceedings of a court without jurisdiction of the subject matter are a nullity." *Burgess v. Gibbs*, 262 N.C. 462, 465 (1964) (citation omitted).

37. It is clear that "[a]s the party invoking jurisdiction, plaintiff has the burden of establishing standing." *Queen's Gap Cmty. Ass'n v. McNamee,* 2011 NCBC LEXIS 37, at **4 (N.C. Super. Ct. Sept. 23, 2011) (cleaned up). In determining the existence of subject matter jurisdiction, the Court may consider matters outside the pleadings. *Emory v. Jackson Chapel First Missionary Baptist Church,* 165 N.C. App. 489, 491 (2004) (cleaned up). However, "if the trial court confines its evaluation [of standing] to the pleadings, the court must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff." *Munger v. State*, 202 N.C. App. 404, 410 (2010) (quoting *DOT v. Blue*, 147 N.C. App. 596, 603 (2001)).

38. "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). The Court may also "reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577 (2009) (cleaned up).

39. In evaluating antitrust claims asserted under North Carolina law, this Court has stated the following:

> The Motion [to Dismiss] must be decided as a matter of state law; however, it is proper for the Court to consult federal case law. *See Rose v. Vulcan Materials Co.*, 282 N.C. 643, 656-57, 194 S.E.2d 521, 530-31 (1973) (consulting federal decisions to inform the court's restraint-of-

trade analysis). The Court is fully cognizant that the Motion [to Dismiss] must be resolved under North Carolina's lenient Rule 12(b)(6) standard rather than the more exacting federal plausibility standard that governs the federal antitrust precedents that the parties cite in their briefs. *Compare Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970) (noting that a pleading complies with North Carolina's standard if it gives sufficient notice of the events underlying the claims), *with Bell Atl. Corp. v. Twombly*, 550 U.S. 544 556-57, 127 S. Ct. 1955, 167 L. Ed. 929 (2007) (requiring that a complaint must state a plausible claim).

*Sitelink Software, LLC v. Red Nova Labs, Inc.*, 2016 NCBC LEXIS 45, at **17 (N.C. Super Ct. June 14, 2016); *see also Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 376 N.C. 63, 70 (2020) (applying North Carolina's Rule 12 standard in reviewing antitrust claims brought under North Carolina law). "Dismissal of an antitrust claim 'at the pre-discovery, pleading stage [is] . . . generally limited to certain types of glaring deficiencies.'" *Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 63, at *25 (N.C. Super. Ct. Oct. 10, 2019) (quoting *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 NCBC LEXIS 33, at *46 (N.C. Super Ct. April 11, 2017)). Nevertheless, "even North Carolina's lenient pleading standard does not allow for an antitrust claim to continue when there are insufficient or conclusory allegations of market power." *Id.* (citing *Sitelink*, 2016 NCBC LEXIS 45, at *29–30).

## ANALYSIS

### I. Standing

40. The Court first turns to Defendants' contention that Plaintiffs lack standing to bring this action. In support of this argument, Defendants cite federal case law barring "indirect purchasers" from asserting antitrust claims under federal antitrust law. Defendants argue that patients such as Plaintiffs who are covered by

commercial insurance plans—and therefore have payment for their care subsidized (or paid entirely) by commercial insurers—are merely indirect purchasers of Defendants' services and therefore lack standing to assert the antitrust claims in the Complaint.

41. In response, Plaintiffs argue that North Carolina courts have expressly recognized that indirect purchasers who seek to assert antitrust claims under state law—including antitrust claims against hospitals—possess standing to assert those claims.

42. The United States Supreme Court has held that "indirect purchasers"— that is, those who do not purchase goods or services directly from an alleged monopolist but instead from another party "downstream"—do not have standing to bring suit under the federal antitrust statutes. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 728 (1977). However, our Court of Appeals has on at least two occasions expressly recognized the standing of indirect purchasers to bring antitrust claims in North Carolina. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 573, 584 (1996) (allowing indirect purchasers of baby formula to sue for violation of antitrust laws under Chapter 75); *Teague v. Bayer AG*, 195 N.C. App. 18, 19, 29 (2009) (recognizing indirect purchaser standing for consumer who purchased products containing a component subject to an alleged price-fixing scheme).

43. Moreover, this Court has previously rejected a similar standing-related argument in *Dicesare*. In that case, the plaintiffs, who were each covered by a commercial insurance plan, sued a hospital over anti-steering and confidentiality

restrictions that it used in negotiations with commercial healthcare insurers. *Dicesare*, 2017 NCBC LEXIS 33, at *4–15. The hospital moved to dismiss the complaint for lack of standing, but the Court rejected its argument based on *Teague*. The Court ruled that the plaintiffs had alleged "an injury in fact—increased cost and less consumer choice—that is fairly traceable under the allegations of the [complaint] to the Hospital's imposition of the [contractual] provisions." *Id*. at *21. This Court expressly stated that "[i]n North Carolina*, indirect purchasers have standing under section 75-16 to bring an action for violations of Chapter 75.*" *Id*. at *20 (emphasis added and citations omitted).

44. Similarly, the Complaint's allegations in the present case, as discussed extensively above, sufficiently identify anticompetitive practices in which Defendants have engaged during their negotiations with commercial insurers leading, among other things, to higher insurance premiums for consumers along with denial of access to information regarding price and quality as to Defendants' facilities so as to establish their standing to advance their antitrust claims in this action.[8]

45. Therefore, Defendants' Motion to Dismiss under Rule 12(b)(1) for lack of standing is DENIED.

## II. Restraint of Trade

46. Plaintiffs assert that by virtue of the practices described above Defendants have engaged in an unlawful restraint of trade in violation of Chapter 75

---

[8] Defendants also argue that Plaintiffs are too "differently situated to have standing" to raise any of the claims in the Complaint. (ECF No. 28, at p. 34.) However, the Court is unpersuaded by this argument as well.

of the North Carolina General Statutes. N.C.G.S. § 75-1 states in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal." N.C.G.S. § 75-1 (2021).[9]

47. "To establish a claim for restraint of trade under North Carolina law, a party must plead '(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade.' " *Se. Anesthesiology*, 2019 NCBC LEXIS 63, at *27 (quoting *Dicesare*, 2017 NCBC LEXIS 33, at *44). Our Supreme Court has held that federal decisions under the Sherman Act are instructive in evaluating claims under § 75-1. *See Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655 (1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying G.S. 75-1, is nonetheless instructive in determining the full reach of that statute.").

48. It is undisputed that the alleged practices put at issue in the Complaint are properly viewed as vertical restraints rather than horizontal restraints. "Restraints are generally categorized as horizontal or vertical. A horizontal restraint is an agreement among competitors on the way in which they will compete with one another. Vertical restraints are restraints imposed by agreement between firms at different levels of distribution." *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (cleaned up).

---

[9] N.C.G.S. § 75-2 states that "[a]ny act, contract, combination in the form of trust, or conspiracy in restraint of trade or commerce which violates the principles of the common law is hereby declared to be in violation of G.S. 75-1." N.C.G.S. § 75-2 (2021).

49. The parties disagree, however, on the applicable standard for evaluating whether the restraints Plaintiffs allege are lawful. Plaintiffs assert that the Court should utilize the "*per se*" standard of review, while Defendants contend that the appropriate standard is the "rule of reason." "With certain narrow exceptions, sections 75-1 and 75-2, like their federal counterparts, prohibit restraints of trade or commerce only when such restraints are unreasonable." *Sitelink*, 2016 NCBC LEXIS 45, at **18 (cleaned up). "Under the *per se* rule, certain practices, such as horizontal price-fixing, are presumed unreasonable and thus considered illegal *per se*." *Dicesare*, 2017 NCBC LEXIS 33, at *44–45 (citing *United States v. Am. Express Co.*, 838 F.3d 179, 193–94 (2d Cir. 2016)).

50. In *Dicesare*, this Court noted that "[a] vertical restraint . . . is generally evaluated under the rule of reason." *Id*. at *45 (citing *Am. Express.*, 838 F.3d at 194). Indeed, the United States Supreme Court has confirmed that the rule of reason applies to vertical price restraints. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007) ("We now hold that . . . vertical price restraints are to be judged by the rule of reason."). Following these precedents, the Court concludes that the rule of reason is applicable to Plaintiffs' restraint of trade claim.

51. This Court discussed the application of the rule of reason standard to restraint of trade claims in *Dicesare*:

> Under the rule of reason, Plaintiffs have the initial burden of showing that Defendant's challenged conduct has an adverse effect on competition as a whole in the relevant market. *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 380. "Examples of actual anticompetitive effects include reduced output, decreased quality, and supracompetitive pricing." *Am. Express Co.*, 838 F.3d at 194. Anticompetitive effects may

be shown directly by establishing an actual adverse effect on competition. *Id.* Anticompetitive effects may also be shown indirectly "by showing that the defendant has 'sufficient market power to cause an adverse effect on competition.' " *Id.* (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 96 (2d Cir. 1998)). Market power alone, however, is insufficient to establish anticompetitive effects indirectly. *Id.* at 194-95. Plaintiffs must also show "some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Tops Mkts., Inc.,* 142 F.3d at 97. "[T]he structure of the interbrand market means, in practice, an inquiry into whether the challenged behavior significantly restrict[s] competitors' ability to enter the relevant market and compete—in other words, whether the challenged behavior create[s] significantly higher barriers to entry." *MacDermid Printing Sols. LLC v. Cortron Corp.,* 833 F.3d 172, 183-84 (2d Cir. 2016) (internal quotation marks omitted).

*Id.* at *45–46.

52. The insured patients in *Dicesare* sued a hospital, in part, for its use of anti-steering provisions in its contracts with commercial health insurers, contending they constituted an illegal restraint of trade under North Carolina law. *Id.* at *44. This Court denied the hospital's motion to dismiss the complaint, ruling that the plaintiffs' allegations that the anti-steering provisions enabled supracompetitive pricing, reduced competition, and lessened consumer incentives to seek more cost-effective care survived a Rule 12 challenge. *Dicesare,* 2017 NCBC LEXIS 33, at *50–53. In explaining its ruling, this Court stated the following:

The [complaint] alleges that the Anti-Steering Provisions have the following anticompetitive effects in the relevant market: (1) protecting the Hospital's market power and enabling it to charge supracompetitive prices; (2) substantially lessening competition among providers of acute inpatient hospital services; (3) restricting the introduction of innovative insurance products designed to achieve lower prices for, and higher quality of, acute inpatient hospital services; (4) reducing consumers' incentives to obtain acute inpatient hospital services from more cost-effective providers; and (5) depriving insurers and insureds of the

benefits of a competitive market for acute inpatient hospital services. Plaintiffs further allege that, due to the Anti-Steering Provisions, Plaintiffs have less insurance plans from which to choose and are denied access to information about the cost and quality of the Hospital's services compared to its competitors.

Regardless of whether the method of satisfying the adverse effect requirement is labeled direct or indirect, "there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market. How actual harm is shown determines whether proof of market power is also required." *MacDermid Printing Sols. LLC*, 833 F.3d at 182-83 (footnote omitted). Protecting market power through means other than competition on the merits, as Plaintiffs allege here, has been found to constitute an anticompetitive effect. *Microsoft Corp.*, 253 F.3d at 62. Moreover, Plaintiffs contend that the Anti-Steering Provisions enable the Hospital to charge, and that the Hospital does in fact charge, supracompetitive prices that are passed on to insureds. Supracompetitive pricing can satisfy the proof requirements of an actual adverse effect on competition. *Am. Express Co.*, 838 F.3d at 205-06 ("Plaintiffs might have met their initial burden [at trial] under the rule of reason by showing . . . that Amex's pricing was set above competitive levels within the credit-card industry (i.e., supracompetitive pricing).").

*Id.* at *50–52.

53. A federal court in North Carolina similarly addressed a motion to dismiss a restraint of trade claim involving a hospital's utilization of anti-steering restrictions in *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720 (W.D.N.C. 2017) ("*Atrium*"). In *Atrium*, a hospital that allegedly possessed a 50% share of the relevant healthcare market was sued by the state and federal governments over the use of anti-steering provisions in its contracts with commercial health insurers. *Id.* at 723–25.[10] In denying the hospital's motion to dismiss, the

---

[10] The plaintiff's claim for restraint of trade was brought pursuant to Section 1 of the Sherman Act, which prohibits "agreements that unreasonably restrain trade." *Atrium*, 248 F. Supp. 3d at 725.

court concluded that the plaintiffs had satisfied their burden under the federal Rule 12 standard by stating a plausible claim for restraint of trade by alleging both direct and indirect adverse effects on competition. *Id.* at 730.

54.     First, the *Atrium* court found that the plaintiffs had alleged direct evidence of an unreasonable restraint by alleging that "[i]ndividuals and employers in the . . . area pay higher prices for health insurance coverage, have fewer insurance plans from which to choose, and are denied access to consumer comparison shopping and other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely." *Id.* at 729.

55.     Second, the court determined that the plaintiffs had also satisfied their burden of pleading an unreasonable restraint via the indirect method by alleging the existence of sufficient market power through a large market share coupled with the hospital's ability to force insurers to accept unwanted contractual provisions. *Id.* at 730–31. The court noted that the plaintiffs had further asserted the "potential for genuine adverse effects on competition" by virtue of the hospital's ability to charge higher than competitive prices in a manner that was tied "directly to [the hospital's] market power by alleging that insurers would prefer not to have steering restrictions in their contract but are unable to remove them because of the necessity to include [the hospital] in their plans." *Id.* (cleaned up).

56.     With regard to Plaintiffs' allegations here that Defendants have unlawfully restrained trade through an "all or nothing" tying arrangement, similar

claims arising in a virtually identical context against a hospital system called Sutter Health ("Sutter") have been addressed by both federal and state courts in California.

57. In *Sidibe v. Sutter Health*, No. 12-cv-04854-LB, 2021 U.S. Dist. LEXIS 45221 (N.D. Cal. Mar. 9, 2021), class action plaintiffs, who all either paid for health insurance individually or through their employers, brought suit against Sutter in federal court alleging, *inter alia*, an unlawful tying arrangement that violated federal antitrust laws and California law by causing higher prices to be paid by consumers. *Id*. at *3–6. According to the plaintiffs' allegations, Sutter had employed a tying arrangement in which it used "its market power for inpatient services in seven Northern California Markets" (in which Sutter was "the only or dominant hospital") to force insurers to *also* include in their networks Sutter's inpatient services in *other* geographic markets. *Id*. at *4. In other words, the plaintiffs alleged that Sutter had used its market power in the Northern California markets (the tying markets) to force insurers to also include in-network Sutter's inpatient services in the other markets (the tied markets) even though the insurers did not necessarily want to include those services in their insurance plans. *Id*. Plaintiffs also challenged several other practices of Sutter, including its use of anti-steering restrictions such as a contractual provision preventing insurers from "chang[ing] Sutter's status as a preferred provider without Sutter's permission." *Id*.

58. In analyzing Sutter's motion for summary judgment, the federal district court summarized the key issue concerning the plaintiffs' tying allegations as follows:

> The main issue is whether Sutter forces insurers — through its systemwide contracts with them — to include (in their networks)

inpatient services at Sutter hospitals in the Tied Markets as a condition to access to inpatient services at Sutter hospitals in the Tying Markets (where Sutter is the only or dominant hospital), resulting in higher prices.

*Id.* at *6.

59.     Because of the relevance and thoroughness of the *Sidibe* court's subsequent analysis of this issue, it is helpful to quote this portion of the opinion in full:

> Sutter contends that it never conditioned access to inpatient services in the Tying Markets to the health plans' including inpatient services in the Tied Markets in their networks, and it never required health plans to pay for one service as a condition for accessing another service. Instead, it gave discounted rates to the health plans for including Sutter's hospitals in their networks. A systemwide contract is not necessarily unlawful. But the theory of liability is that Sutter used its market power for inpatient services in the Tying Market to force the health plans to include (in their networks) Sutter inpatient services in the Tied Markets and then had terms that prevented the health plans from excluding Sutter tied hospitals from the networks or establishing lower-cost networks. Fact disputes about how Sutter exercised its market power preclude summary judgment on the tying claims.
>
> A tying arrangement occurs where "a seller with market power in one product market [] extend[s] its market power to a distinct product market*." Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 913-14 (cleaned up) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)).
>
> The elements of a tying claim are as follows: "(1) [] the defendant tied together the sale of two distinct products or services; (2) [] the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) [] the tying

arrangement affects a not insubstantial volume of commerce in the tied product market." *Id.* at 913 (cleaned up); *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.*, 101 Cal. App. 3d 532, 542, 161 Cal. Rptr. 811 (1980) (similar elements for a tying claim under California's Cartwright Act).

Sutter contends that its systemwide contracts do not impose a tie because it does not condition the sale of one product to a health plan's purchase of another product. Instead, its contracts are its mechanism for setting prices, giving discounted rates to a plan if it is in a network and non-discounted non-par rates if it is not in a network. But the facts are disputed. First, the contracts were systemwide and required health plans to include Sutter inpatient services in the Tied Markets. There are fact disputes about whether this was merely Sutter's setting its prices, or rather, whether Sutter forced higher prices in the Tied Markets that were passed through to consumers through insurance premiums. For example, the 95-percent non-par rates were higher than the insurers' customary out-of-network rates. As a result, the health plans allegedly could not build narrow networks (at a lower cost) that excluded Sutter because there was no cost advantage (compared to a network that included Sutter hospitals). Second, the contracts prevented insurers from changing Sutter's status in the health plans' networks (by, for example, putting Sutter providers into less preferred tiers resulting in lower costs) without Sutter's consent. There is evidence that Sutter permitted health plans to exclude or tier Sutter hospitals. But there is evidence that it was occasional, that Sutter denied requests to put Sutter hospitals in non-preferred tiers, and that when health plans tried to market lower-cost tiered networks that did not include Sutter in the favored tier, Sutter threatened to terminate the contracts and sue the plans. There is evidence too that the plans objected to the provisions and ultimately acceded to them because they had no choice.

*Id.* at *14–17.

60. In related antitrust litigation brought against Sutter in state court by a different group of plaintiffs, a California Superior Court allowed a restraint of trade claim to proceed based on allegations that Sutter Health "extract[ed] supracompetitive prices" when it "(1) require[d] [the plaintiff insurer] to offer its beneficiaries the services of either all Sutter hospitals or none of them; (2) prohibit[ed]

[the plaintiff insurer] from incentivizing its beneficiaries to choose competition hospitals and (3) prohibit[ed] Blue Shield—the network vendor—from disclosing Sutter's prices." *UFCW & Emps. Benefit Trust v. Sutter Health*, Case No. CGC—14-538451, at pp. 2, 7 (Cal. Super. Ct. Apr. 1, 2016). In a demurrer to the plaintiffs' complaint, Sutter argued that the allegations concerning adverse effects on competition did not meet the required threshold necessary to state a claim for an unreasonable restraint of trade. *Id.* at p. 7.

61. The Superior Court disagreed, holding instead "that Sutter's all-or-nothing, anti-incentive, and price secrecy terms foreclose price competition by rival providers[.]" *Id.* The court similarly rejected Sutter's contention that the plaintiffs had insufficiently pled an adverse effect on competition by means of a "restricted output in a specially defined relevant market." *Id.* (cleaned up). The court held that the plaintiffs' allegation that "network vendors have no leverage to bargain on price because they cannot exclude Sutter from any health plans" was sufficient to allow the claim to proceed. *Id.*

62. Based on this Court's thorough review of the Complaint and the briefs in the present action and its careful consideration of the parties' arguments as well as its extensive review of relevant case law from around the country, the Court is unable to agree with Defendants that Plaintiffs have failed to sufficiently allege a valid claim for restraint of trade under Rule 12(b)(6).

63. To be sure, the Complaint lacks specificity—in certain respects—in connection with Plaintiffs' broad allegations of anticompetitive effects stemming from

Defendants' alleged conduct such as details regarding the exclusion of competing providers in the relevant markets or a lack of patient choice concerning the provision of healthcare services.

64. But what Plaintiffs *have* alleged is that (1) through the contractual restrictions at issue, Defendants are coercing insurers into including Mission facilities in the insurers' networks that they do not want; and (2) as a result, the insurers lack the power they would normally be able to exercise in a competitive market to decide which facilities should and should not be included in their networks. (Compl. ¶¶ 134, 182, 229.)

65. In addition, these contractual provisions—most notably, the anti-steering provisions—have the potential to preclude Defendants' competitors from receiving patients from insurers who would otherwise direct those patients to them based on factors such as higher quality or lower cost. (Compl. ¶ 229.)

66. Moreover, the Complaint does contain at least some allegations that decreased quality, higher prices, and reduced output have resulted from these contractual provisions that suffice for purposes of Rule 12(b)(6) review.

67. Thus, at a minimum, Plaintiffs have satisfied their burden of alleging an unreasonable restraint of trade via the indirect method by alleging the existence of sufficient market power held by Defendants in the Asheville Inpatient Services market, coupled with the potential for anticompetitive effects stemming from unwanted contractual provisions unilaterally imposed by Defendants on insurers.

Defendants' argument that additional allegations are required at the pleadings stage lacks merit. As the Third Circuit stated in rejecting a similar argument,

> [t]he defendants make a half-hearted argument that even if the complaint alleges that they formed a conspiracy to shield one another from competition, the [restraint of trade] claim is still deficient because the complaint does not allege that the conspiracy unreasonably restrained trade. We disagree. At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets. *See Howard Hess*, 602 F.3d at 253; *Brown Univ.*, 5 F.3d at 668. Anticompetitive effects include increased prices, reduced output, and reduced quality. *Toledo Mack*, 530 F.3d at 226; *Brown Univ.*, 5 F.3d at 668-69.
> . . .
> The complaint also plausibly suggests that by shielding Highmark from competition, the conspiracy resulted in increased premiums and reduced output in the market for health insurance. These allegations are sufficient to suggest that the conspiracy produced anticompetitive effects in the relevant markets.

*W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 100-01 (3d Cir. 2010).

68. The restraints resulting from these contractual provisions may or may not ultimately be deemed unreasonable, but the Court is satisfied at this early juncture that Plaintiffs are entitled to discovery on this issue. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 434 (4th Cir. 2015) (cleaned up) ("Our decision should not be mistaken for an ultimate endorsement of the merits of [the plaintiff's] case. At this point, [the plaintiff's] prospects for success are largely irrelevant, as a lawsuit need not be meritorious to proceed past the motion-to-dismiss stage. . . . To dismiss [the plaintiff's] complaint because of some initial skepticism would be to

mistakenly collapse discovery, summary judgment, and trial into the pleading stages of a case.").[11]

69.     Thus, based on the above, Defendants' Motion to Dismiss is DENIED as to Plaintiffs' restraint of trade claim.  *See, e.g., Hyundai Motor Am., Inc. v. Direct Techs. Int'l, Inc.*, No. 3:17-cv-732-MOC-DSC, 2018 U.S. Dist. LEXIS 146780, at *5–6 (W.D.N.C. Aug. 29, 2018) (denying motion to dismiss as to restraint of trade claim based on allegations of tying scheme by defendant).[12]

### III.    Monopolization

70.     The Court reaches a different conclusion, however, regarding Plaintiffs' monopolization claims.

71.     Our General Statutes provide that

[i]t is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce in the State of North Carolina.

---

[11] Although Defendants contend that the contractual provisions at issue are actually *procompetitive* rather than *anticompetitive*, the Court cannot make such a determination at the pleadings stage.  During discovery, Defendants will have a full and fair opportunity to establish the procompetitive benefits of these provisions.  *See Robertson v. Sea Pines Real Estates Cos.*, 679 F.3d 278, 292 (4th Cir. 2012) ("At this early stage of the litigation, we are not in a position to weigh the alleged anticompetitive risks of the [challenged conduct] against their procompetitive justifications.  This rule of reason inquiry is best conducted with the benefit of discovery and we thus express no view on the merits of the litigation beyond recognizing the sufficiency of the complaints."); *Dicesare*, 2017 NCBC LEXIS 33, at *52–53 (cleaned up) ("In its briefs, the Hospital conflates Plaintiffs' initial burden of proving an adverse effect on competition with the ultimate determination of whether those anticompetitive effects outweigh any procompetitive benefits that may be offered by Defendant.  At this stage of the proceeding, however, the Court is required to take the allegations of the [Complaint] as true and all contravening assertions in the Answer as false.  Thus, Plaintiffs' allegations of adverse effects on competition must be accepted as true, and Defendant's pro-competitive justifications considered unproven.").

[12] Defendants also raise an argument that some of Plaintiffs' claims are untimely based on the applicable statute of limitations.  However, because none of the claims asserted in the Complaint are time-barred on their face, the Court deems this argument to be premature.

N.C.G.S. § 75-2.1 (2021).

72.     A plaintiff is required to allege the following elements to state a valid claim for monopolization: "(1) the possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Sykes v. Health Network Sols., Inc.*, 2017 NCBC LEXIS 73, at \*60 (N.C. Super. Ct. Aug. 18, 2017) (cleaned up).

73.     This Court has held that "[i]n determining whether monopoly power exists, courts look at defendant's market share, the durability of defendant's market power, and whether there are significant barriers to entry." *Dicesare*, 2017 NCBC LEXIS 33, at \*54–55 (cleaned up). "Generally, seventy percent (70%) to seventy-five percent (75%) market share is necessary to sustain a monopolization claim and thirty percent (30%) to fifty (50%) is presumed necessary to sustain a claim for attempted monopolization." *Se. Anesthesiology*, 2019 NCBC LEXIS 63, at \*32 (citations omitted).

74.     The markets relevant to Plaintiffs' monopolization claim are the three antitrust markets outlined in the Complaint, which—as noted above—consist of the Asheville Region Inpatient Services market, the Asheville Region Outpatient Services market, and the Outlying Regions Inpatient and Outpatient Services market.

75.     As an initial matter, the Complaint purports to assert, *inter alia*, a monopolization claim under Article I, Section 34 of the North Carolina Constitution.

However, Defendants argue—and Plaintiffs concede—that this constitutional provision *only* applies against state actors, a classification that does not include Defendants. *See, e.g., Deminski v. State Bd. of Educ.*, 377 N.C. 406, 413 (2021) (cleaned up) ("[T]o allege a cause of action under the North Carolina Constitution, a state actor must have violated an individual's constitutional rights."); *Bailey v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 158 N.C. App. 449, 457 (2003) ("As [Defendant] is not a State actor, we conclude that both plaintiffs' section 19 and 34 claims fail."). Therefore, Plaintiff's monopolization claim under the North Carolina Constitution is DISMISSED with prejudice.

76. Plaintiffs' remaining monopolization claims are based on three distinct theories—unlawful acquisition of a monopoly, monopoly maintenance, and monopoly leveraging. The Court will discuss each theory in turn.

**A. Monopoly Acquisition**

77. With regard to Plaintiffs' monopoly acquisition claim, it is important to be clear as to what Plaintiffs are and are not arguing. Although they allege that Defendants possessed a monopoly in the Asheville region for inpatient services through Mission Hospital even prior to HCA's acquisition of Mission's assets in 2019, they do not expressly contend that the monopoly was originally obtained in an unlawful manner.[13] As Plaintiffs concede, a lawfully obtained monopoly does not violate the antitrust laws. *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 51

---

[13] Indeed, such a position would be difficult to maintain given the General Assembly's enactment of the COPA laws and the protection to Mission provided therein from antitrust liability.

(D.C. Cir. 2001) (cleaned up) ("[M]erely possessing monopoly power is not itself an antitrust violation.") Instead, Plaintiffs argue that HCA's takeover of the Mission system, which allegedly occurred in connection with HCA's specific intent to monopolize, was unlawful under N.C.G.S. § 75-2.1.

78. Although Plaintiffs allege that HCA owns hospitals across the country, the Complaint concedes that HCA did not own any *in North Carolina* prior to the acquisition of the Mission system. (Compl. ¶ 149.) Thus, this case does not present the sort of antitrust issues that would exist following a merger, for example, between two existing competitors in the North Carolina healthcare services market. Instead, the transaction resulting in HCA's acquisition of Mission's assets simply resulted in a swap of ownership without any accompanying change in competition. Plaintiffs have not cited any case law supporting the notion that such a transaction under these circumstances—without more—violates the antitrust laws. Therefore, Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' monopoly acquisition theory, and this claim is DISMISSED without prejudice.

**B. Monopoly Maintenance**

79. Nor have Plaintiffs stated a valid claim under a theory of monopoly maintenance. Plaintiffs' monopoly maintenance claim is based on their contention that Defendants engaged in anticompetitive conduct in order to maintain their monopoly on inpatient services in the Asheville region based on the dominance of Mission Hospital-Asheville.

80.     However, a careful reading of the Complaint reveals that all, or virtually all, of Plaintiffs' allegations concerning the contractual restrictions utilized by Defendants relate to markets *other than* the Asheville Region Inpatient Services market.[14]  As such, although these allegations are relevant to Plaintiffs' monopoly *leveraging* claim—which is discussed below—they do not support Plaintiffs' monopoly *maintenance* claim.  The Complaint fails to contain any nonconclusory allegations that Defendants are engaging in anticompetitive conduct specifically designed to prevent competitors from entering the Asheville Region Inpatient Services market or to otherwise unlawfully foreclose competition in that market.

81.     The Sutter Health cases are, once again, instructive.  In *Sidibe*, the federal court rejected the plaintiff's monopoly maintenance claim on similar grounds:

> Sutter contends that there is no evidence that its contracting practices led to its acquiring or maintaining market power in the Tying Markets. Instead, as the plaintiffs' expert opines, the undisputed facts establish that Sutter's market power exists because nearly all hospitals are in rural areas, and the operator of those hospitals automatically has some degree of market power.
>
> The plaintiffs respond (in a single paragraph) that "by forcing the [health plans] to accept its anticompetitive contract provisions, Sutter has maintained its monopoly power over [inpatient hospital services] in its Tying Markets, particularly at Alta Bates in the Berkeley-Oakland market."  The plaintiffs cite Sutter's contention during the Alta Bates/Summit merger — that health plans could steer away from Alta Bates to constrain prices — and contrast it with Sutter's subsequent imposition of the anti-steering/anti-tiering terms in its contracts that prevented health plans from steering members away from the more expensive tied hospitals and Alta Bates (a tying hospital) and launching more inexpensive, tiered networks that put Sutter in a less-preferred tier.

[14] Indeed, the whole essence of Plaintiffs' tying theory is that Defendants seek to require insurers to include in their networks Defendants' facilities in markets *besides* the Asheville Region Inpatient Services market.

. . .

> The plaintiffs offer no evidence for six of the seven Tying Markets (and the corresponding hospitals). For those markets and hospitals, the evidence is undisputed that Sutter's power exists because the markets are rural. As to Alta Bates, the plaintiffs identify evidence — through their expert — that more steering would have resulted in lower prices there. *But that is not the equivalent of preventing other hospitals from entering or expanding in the Berkeley-Oakland HSA (meaning, hospital-service area) Tying Market. Instead, the theory of liability in the complaint is that Sutter used its market power in the Tying Markets (where it faced no competition) to force health plans to include Sutter hospitals in the Tied Markets (where it faced competition).*
>
> In sum, the plaintiffs have not produced evidence that shows disputed material facts about Sutter's willful maintenance of monopoly power.

2021 U.S. Dist. LEXIS 45221, at *20–22 (emphasis added); *see also Blix Inc. v. Apple, Inc.*, No. 19-1869-LPS, 2021 U.S. Dist. LEXIS 128137, at *9 (D. Del. July 9, 2021) (dismissing monopoly maintenance claim premised on tying allegations under Rule 12(b)(6) because "[the plaintiff] does not explain how [the defendants' alleged tying conduct] restricts competition in [the tying market]"); *Dreamstime.com, LLC v. Google, LLC*, No. C 18-01910 WHA, 2019 U.S. Dist. LEXIS 13408, at *25–26 (N.D. Cal. Jan. 28, 2019) (cleaned up) ("[N]othing [plaintiff] has alleged demonstrates that [defendant] has maintained its monopoly by engaging in conduct to 'chill vigorous competition' *in the relevant market*").

82. Therefore, based on the above, Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' monopoly maintenance claim, and this claim is DISMISSED without prejudice.

**C. Monopoly Leveraging**

83.    Plaintiffs also assert a monopolization claim premised on a theory of monopoly leveraging.  "A monopoly leveraging claim is a . . . monopolization claim or attempted monopolization claim involving conduct in more than one market.  To succeed, a plaintiff must demonstrate 'that a party has a monopoly in one area, uses unlawful acts to leverage that monopoly into another area, and achieves or is likely to achieve that second monopoly.' "  *Simon & Simon, PC v. Align Tech., Inc.*, No. 19-506 (LPS), 2020 U.S. Dist. LEXIS 72499, at *23 (D. Del. Apr. 24, 2020) (quoting *IQVIA Inc. v. Veeva Systems, Inc.*, No. 17-00177 (CCC), 2018 U.S. Dist. LEXIS 171456, at *4 (D.N.J. Oct. 3, 2018)).

84.    "Monopoly leveraging . . .  is not a standalone theory of liability under Section 2 [of the Sherman Act]."  *Id.* (citing *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 415 n. 4 (2004)).  Instead, "[i]n order to state a claim under a leveraging theory, a plaintiff must sufficiently allege that the defendant either has obtained monopoly power in the second market or, in the case of an attempted monopoly claim, has a 'dangerous probability of success' in monopolizing a second market."  *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d. 1134, 1150 (D. Ore. 2018) (quoting *Trinko*, 540 U.S. at 415 n. 4).

85.    Thus, with regard to this claim, Plaintiffs must sufficiently allege that Defendants exercise (or that there is a dangerous likelihood they will exercise) monopoly market power in the Asheville Region Outpatient Services market or the Outlying Regions Inpatient and Outpatient Services Market.

86. With regard to *outpatient* services, the Complaint makes no attempt to allege *any* market share held by Defendants either in the Asheville Region market or in the Outlying Regions market.

87. As for *inpatient* services in the Outlying Regions, the Complaint alleges market shares held by Defendants for each of the individual five counties comprising the Outlying Regions in varying percentages—all in excess of 70%. Critically, however, the Complaint suggests—and Plaintiffs' counsel conceded at the 27 April 2022 hearing on the pending Motion—that those market share numbers are based largely, if not entirely, on *Medicare* data.

88. Plaintiffs' Complaint makes clear that this lawsuit concerns the *private* insurance market, rather than the "the sale of such services to government payers." (*See* Compl. ¶ 109 ("The relevant product markets do not include sales of such services to government payers, e.g., Medicare, Medicaid, and TRICARE (covering military families), because a healthcare provider's negotiations with commercial health plans are separate from the process used to determine the rates paid by government payers.").)

89. On a number of occasions, courts have acknowledged the fundamental differences between government payers and private insurers in antitrust cases and refused to consider Medicare or Medicaid data offered in support of such claims.

90. For example, in *FTC v. Sanford Health*, No. 1:17-cv-133, 2017 U.S. Dist. LEXIS 215937 (D. N. D. Dec. 15, 2017) the court rejected the notion that government

payers should be considered together with commercial insurers in the antitrust context, stating the following:

> A relevant product market definition may be based on a distinct category of customers. *FTC v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016). The plaintiffs' proposed market definition includes only commercial insurers, to the exclusion of government payers—Medicare and Medicaid. There is no evidence that contracting with government payers involves the two-stage competition described above. The process of providers reaching agreements with [Blue Cross] is not so similar to that involved in contracting with government providers that government providers should be included as customers in the relevant market. This court finds it appropriate to consider a relevant market limited to a distinct category of customers—commercial health insurance plans.

*Id.* at *34.

91.     The court in *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield*, 997 F. Supp. 2d. 142 (D. R. I. 2014) followed the same approach, acknowledging the differences between private insurers and government payers in this context.

> In the marketplace for the purchase of hospital services, however, Medicare and Medicaid purchase hospital services, but they can only do so for the limited number of individuals that qualify for those programs. The remainder of the market consists of private insurers purchasing hospital services for their subscribers. Viewing the product market from the perspective of an aggrieved private purchaser of hospital services, then, it is appropriate to exclude Medicare and Medicaid purchases because the private purchaser was never competing to purchase those services in the first place.

*Id.* at 162.

92.     The Court finds these authorities persuasive and will therefore disregard the Complaint's market share data from Medicare sources. Having made this determination, the Court therefore concludes that, for both outpatient services in all regions and inpatient services in the Outlying Regions, Plaintiffs have failed to

allege a sufficient market share held by Defendants to support a monopolization claim. *See Se. Anesthesiology*, 2019 NCBC LEXIS 63, at \*34–35 (cleaned up) (dismissing a section 75-2.1 claim pursuant to Rule 12(b)(6) based on plaintiff's failure to allege "any market share possessed by [Defendants] in the relevant market or a dangerous probability of success of acquiring market share"); *see also Distance Learning Co. v. Maynard*, No. 19-cv-03801-KAW, 2020 U.S. Dist. LEXIS 99256, at \*23 (N.D. Cal. June 4, 2020) ("Because Plaintiff has not alleged facts demonstrating adequate market share, Plaintiff's § 2 claims must be dismissed"); *Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, No. No.: 2:14-cv-02333-RDP, 2016 U.S. Dist. LEXIS 87022, at \*56–57 (N.D. Ala. July 6, 2016) ("Without any facts concerning a relevant market or market share, there is no way for Plaintiff to demonstrate monopoly power or attempted monopolization . . . . Plaintiff's Sherman Act claims are therefore due to be dismissed with prejudice.").

93.  In seeking to avoid this result, Plaintiffs contend that market share is essentially a proxy for monopoly power, which can be proved directly by other means such as the ability to control prices. As a general proposition, Plaintiffs are correct. *See, e.g., Tops*, 142 F.3d at 97–98 (cleaned up) ("Monopoly power, also referred to as market power, is the power to control prices or exclude competition. It may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market.").

94.  Here, however, the Complaint does not contain sufficient allegations of Defendants' monopoly power in the relevant markets outside the Asheville Region

Inpatient Services market that are sufficient to substitute for the failure to plead such power through market share. In particular, the allegations in the Complaint that Defendants are able to control prices in these other markets are conclusory. Moreover, these allegations are rebutted by the only two specific examples Plaintiffs offer. First, Plaintiffs reference an incident that allegedly occurred in 2017 when (1) Mission allegedly insisted on certain price increases at Mission Hospital-Asheville to Blue Cross Blue Shield of North Carolina ("Blue Cross"); and (2) instead of engaging in the type of negotiations that would exist in a competitive market upon Blue Cross's refusal to agree to the price increases, Mission temporarily took the entire Mission system out-of-network. (Compl. ¶ 164.) However, the Complaint goes on to state that a negotiated result was ultimately reached in which Defendants received a rate increase that was not as high as originally demanded. (Compl. ¶ 164.) Thus, even taking Plaintiffs' allegations as true for purposes of Rule 12(b)(6), this incident undermines their allegation that Defendants possess the power to actually *control* prices.

95. The Complaint's second example concerns another health insurer, Cigna. Plaintiffs allege that a similar dispute occurred following HCA's acquisition of Mission in which HCA "used aggressive contract negotiating tactics" with the goal of obtaining a significant price increase from Cigna. (Compl. ¶ 173.) Once again, however, Plaintiffs' assertions regarding this incident fall far short of sufficiently alleging Defendants' possession of monopoly power. (Compl. ¶ 173.)[15]

---

[15] Indeed, the Complaint does not even allege the ultimate outcome of the dispute with Cigna.

96.     Furthermore, the Court simply disagrees with Plaintiffs' contention that the mere existence of contract disputes such as these—without more—adequately illustrates Defendants' monopoly power in the markets at issue.

97.     In addition, Plaintiffs' allegations throughout the Complaint that Defendants charge supracompetitive prices at their facilities fail to remedy the absence of sufficient allegations about monopoly-level market share in the markets other than the Asheville Region Inpatient Services market.  Courts have repeatedly held that the charging of high prices alone is not an antitrust violation.  *See, e.g., Simpson v. US West Commc'ns.*, 957 F. Supp. 201, 205 (D. Or. 1997) (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979)) ("Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive.").

98.     It is also worth noting that Plaintiffs concede in their Complaint that Defendants face some level of competition in every market other than the Asheville Region Inpatient Services market.  (Compl. ¶¶ 127–28, 204).

99.     Therefore, for all of these reasons, Defendants' Motion to Dismiss is GRANTED without prejudice as to Plaintiffs' monopoly leveraging theory.

## IV.    Attempted Monopolization

100.    Finally, Plaintiffs allege a claim for attempted monopolization. "To prevail on an attempted monopolization claim, Plaintiffs must demonstrate (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive acts; and (3) a dangerous probability of successful monopolization." *Sitelink*, 2016 NCBC LEXIS 45, at **29 (quoting *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F.

Supp. 2d 362, 394 (M.D.N.C. 2002)). "Generally, . . . thirty percent (30%) to fifty (50%) [market share] is presumed necessary to sustain a claim for attempted monopolization." *Se. Anesthesiology*, 2019 NCBC LEXIS 63, at \*32 (cleaned up).

101. Once again, this claim is directed toward the markets other than the Asheville Region Inpatient Services market. For the reasons stated above, Plaintiffs have similarly failed to sufficiently allege a *dangerous likelihood* that Defendants will establish a monopoly in these regions.

102. Therefore, Defendants' Motion to Dismiss is GRANTED without prejudice as to Plaintiffs' attempted monopolization claim. *See, e.g.*, *Se. Anesthesiology*, 2019 NCBC LEXIS 63, at \*34–35 (dismissing attempted monopolization claim for failure to allege any market share in the relevant antitrust market); *Sitelink*, 2016 NCBC LEXIS 45, at \*\*31–32 (dismissing attempted monopolization claim for insufficient allegations of market share).

## CONCLUSION

THEREFORE, IT IS ORDERED as follows:

1. Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) for lack of standing is DENIED.

2. Defendants' Motion to Dismiss Plaintiffs' restraint of trade claim is DENIED.

3. Defendants' Motion to Dismiss Plaintiffs' monopoly acquisition claim is GRANTED, and this claim is DISMISSED without prejudice.

4. Defendants' Motion to Dismiss Plaintiffs' monopoly maintenance claim is GRANTED, and this claim is DISMISSED without prejudice.

5. Defendants' Motion to Dismiss Plaintiffs' monopoly leveraging claim is GRANTED, and this claim is DISMISSED without prejudice.

6. Defendants' Motion to Dismiss Plaintiffs' attempted monopolization claim is GRANTED, and this claim is DISMISSED without prejudice.

7. Defendants' Motion to Dismiss Plaintiffs' monopolization claim under the North Carolina Constitution is GRANTED, and this claim is DISMISSED with prejudice.

SO ORDERED, this the 19th day of September, 2022.


/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases